OPINION OF THE COURT
Chief Judge Wachtler.
The question in this case is whether the liability of manufacturers of the drug diethylstilbestrol (DES) should extend to a so-called "third generation” plaintiff, the granddaughter of a woman who ingested the drug. According to the allegations of the complaint, the infant plaintiff’s injuries were caused by her premature birth, which in turn resulted from damage to her mother’s reproductive system caused by the mother’s in útero exposure to DES. We hold, in accord with our decision in Albala v City of New York (54 NY2d 269), that in these circumstances no cause of action accrues in favor of the infant plaintiff against the drug manufacturers.
I.
The plaintiffs in this case are Karen Enright, born August *381 9,1981, and her parents, Patricia and Earl Enright. According to their complaint, the events underlying this action began more than 30 years ago, when Karen Enright’s maternal grandmother ingested DES during a pregnancy which resulted in the birth of plaintiff Patricia Enright on January 29, 1960. Plaintiffs allege that because of her in útero exposure to DES, Patricia Enright developed a variety of abnormalities and deformities in her reproductive system. As a result, several of her pregnancies terminated in spontaneous abortions and another resulted in the premature birth of Karen Enright. Karen suffers from cerebral palsy and other disabilities that plaintiffs attribute to her premature birth and, ultimately, to her grandmother’s ingestion of DES.
This action was commenced by Patricia and Earl Enright individually and on behalf of their daughter against several manufacturers of DES. After issue was joined, the defendants sought summary judgment dismissing the complaint. Defendants contended that the actions were barred by the Statute of Limitations and by plaintiffs’ inability to identify the manufacturer of the drug ingested by Karen’s grandmother. In addition, defendants argued that Karen’s claims of a preconception tort presented no cognizable cause of action.
Supreme Court, relying principally on Albala v City of New York (54 NY2d 269, supra), agreed with defendants that those claims stemming from Karen’s injuries were not legally cognizable and dismissed all four causes of action brought on her behalf and those asserted by her parents for their emotional injuries resulting from Karen’s birth. Defendants’ motions were otherwise denied, however, leaving intact Patricia En-right’s claims relating to her own physical injuries and Earl Enright’s derivative claim based upon his wife’s injuries.
On cross appeals, the Appellate Division modified by reinstating the third cause of action in the complaint — that cause of action brought on behalf of Karen Enright based upon strict products liability. The Appellate Division agreed with Supreme Court that Albala foreclosed preconception tort liability based upon negligence, but held that public policy in favor of providing a remedy for DES victims justified recognizing a strict products liability cause of action.
Defendants sought leave to appeal to this Court, which the Appellate Division granted, certifying to us the question: "Did this court err, as a matter of law, by reversing so much of the Supreme Court order as granted defendants’ motions dismiss *382 ing the third cause of action in the complaint and, as so modified, affirming the order?” That question must be answered in the affirmative.
We note that no issues are raised on this appeal regarding the still pending claims of Patricia and Earl Enright based on the injuries allegedly sustained by Patricia Enright due to her own in útero exposure to DES. Most of defendants’ attacks on those claims were defused by our recent decision in Hymowitz v Lilly & Co. (73 NY2d 487, cert denied — US —, 110 S Ct 350). Nor do plaintiffs challenge the Appellate Division order to the extent that it affirmed the dismissal of those causes of action brought on behalf of Karen Enright sounding in negligence, breach of warranty and fraud.
Thus, the only issue before us is the propriety of the Appellate Division’s reinstatement of the strict products liability cause of action on behalf of Karen Enright, this so-called "third generation” plaintiff.
II.
The tragic DES tale is well documented in this Court’s decisions and need not be recounted here (see, e.g., Hymowitz v Lilly & Co., supra; Bichler v Lilly & Co., 55 NY2d 571). It is sufficient to note that between 1947 and 1971, the drug, a synthetic estrogen-like substance produced by approximately 300 manufacturers, was prescribed for use and ingested by millions of pregnant women to prevent miscarriages. In 1971, the Food and Drug Administration banned the drug’s use for the treatment of problems of pregnancy after studies established a link between in útero exposure to DES and the occurrence in teen-age women of a rare form of vaginal and cervical cancer. Plaintiffs allege that in útero exposure to DES has since been linked to other genital tract aberrations in DES daughters, including malformations or immaturity of the uterus, cervical abnormalities, misshapen Fallopian tubes and abnormal cell and tissue growth, all of which has caused in this population a marked increase in the incidence of infertility, miscarriages, premature births and ectopic pregnancies.
The Legislature and this Court have both expressed concern for the victims of this tragedy by removing legal barriers to their tort recovery — barriers which may have had their place in other contexts, but which in DES litigation worked a peculiar injustice because of the ways in which DES was *383 developed, marketed and sold and because of the insidious nature of its harm.
For example, prior to 1986, the long-standing rule in this State was that a cause of action for personal injuries caused by a toxic substance accrued and the limitations period began to run upon exposure to the substance (see, Fleishman v Lilly & Co., 62 NY2d 888, cert denied 469 US 1192). The Legislature, recognizing that under this rule claims for injuries caused by exposure to DES and other toxic substances were often time barred before the harmful effects of the exposure could be discovered, changed the law to provide that the limitations period in exposure cases begins to run upon discovery of the injury (see, CPLR 214-c; L 1986, ch 682, § 2). At the same time, the Legislature revived for one year previously time-barred causes of action based on exposure to DES and four other toxic substances (L 1986, ch 682, § 4).
More recently, this Court responded to thé fact that — for a variety of reasons unique to the DES litigation context — a DES plaintiff generally finds it impossible to identify the manufacturer of the drug that caused her injuries. We held that liability could be imposed upon DES manufacturers in accordance with their share of the national DES market, notwithstanding the plaintiffs inability to identify the manufacturer particularly at fault for her injuries (see, Hymowitz v Lilly & Co., supra).
III.
In the present case, we are asked to do something significantly different. We are asked, not to remove some barrier to recovery that presents unique problems in DES cases, but to recognize a cause of action not available in other contexts simply (or at least largely) because this is a DES case.
In Albala v City of New York (54 NY2d 269, 271, supra), we were presented with the question "whether a cause of action lies in favor of a child for injuries suffered as a result of a preconception tort committed against the mother”. There, the mother suffered a perforated uterus during the course of an abortion. Four years later, she gave birth to a brain-damaged child, whose injuries were allegedly attributable to the defendants’ negligence in perforating the mother’s uterus. We declined, as a matter of policy, to recognize a cause of action on behalf of the child, believing that to do so would "require the extension of traditional tort concepts beyond manageable *384 bounds” (id., at 271-272). Among other things, we were concerned with "the staggering implications of any proposition which would honor claims assuming the breach of an identifiable duty for less than a perfect birth” and the difficulty, if such a cause of action were recognized, of confining liability by other than artificial and arbitrary boundaries (id., at 273, citing Park v Chessin, 46 NY2d 401; Howard v Lecher, 42 NY2d 109).
The case now before us differs from Albala only in that the mother’s injuries in this case were caused by exposure to DES instead of by medical malpractice. A different rule is justified, therefore, only if that distinction alters the policy balance we struck in Albala.
The primary thrust of plaintiffs’ argument and the Appellate Division’s decision is that DES itself alters that balance. From the Legislature’s actions in modifying the applicable Statute of Limitations and reviving time-barred DES cases and from our adoption of a market-share liability theory in Hymowitz, plaintiffs perceive a public policy favoring a remedy for DES-caused injuries sufficient to overcome the countervailing policy considerations we identified in Albala. The implication, of course, is that the public interest in providing a remedy for those injured by DES is stronger than the public interest in providing a remedy for those injured by other means — medical malpractice, for example. We do not believe that such a preference has been established.
To be sure, recent developments demonstrate legislative and judicial solicitude for the victims of DES, but they do not establish DES plaintiffs as a favored class for whose benefit all traditional limitations on tort liability must give way. To the extent that special rules have been fashioned, they are a response to unique procedural barriers and problems of proof peculiar to DES litigation.
For example, the Legislature’s enactment of a "discovery” Statute of Limitations was directed at opening up traditional avenues of recovery by removing a procedural barrier that was unreasonable given the nature of DES injuries. Nothing in the legislation suggests that the Legislature intended to expand the basis for liability. Indeed, the language of the statute suggests the opposite conclusion. The discovery rule applies in cases of injury caused by "the latent effects of exposure to any substance * * * upon or within the body” (CPLR 214-c [2]). Exposure is defined as "direct or indirect *385 exposure by absorption, contact, ingestion, inhalation or injection” (CPLR 214-c [1]). Implicit in this language is the notion that some contact with the substance is essential to a cause of action, an element lacking here.[1]
Similarly, our adoption of market-share liability was not prompted by some uncontrolled momentum favoring recovery by all DES plaintiffs; rather, it was justified because identification of the DES manufacturer was an insurmountable barrier in the "singular case [where] manufacturers act[ed] in a parallel manner to produce an identical, genetically marketed product, which causes injury many years later” (Hymowitz v Lilly & Co., supra, at 508). These unique features of DES cases not only made identification difficult, but also made it less relevant to culpability than in other products liability actions, since the tortious conduct of DES manufacturers pervaded the industry. Thus, the market-share theory was adopted "to apportion liability so as to correspond to the over-all culpability of each defendant, measured by the amount of risk of injury each defendant created to the public-at-large.” (Id., at 512.) The Hymowitz decision did not create a new cause of action; it simply adjusted the rules governing a traditional cause of action to circumvent what in this limited context were unreasonable obstacles.
In the present case, however, neither plaintiffs, the Appellate Division, nor the dissent has identified any unique feature of DES litigation that justifies the novel proposition they advance — recognition of a multigenerational cause of action that we have refused to recognize in any other context. The fact that this is a DES case does not by itself justify a departure from the Albala rule.
Closer to the mark, though still falling short, is plaintiffs’ second argument. They note that Albala was a negligence case and that we left open the question whether a different result might obtain under a strict products liability theory, *386 because of the potentially different policy considerations in such a case (see, Albala v City of New York, supra, at 274, n). Having now examined the question in the context of this particular strict products liability claim, we find no basis for reaching a different conclusion than we did in Albala.
On one hand, weighing somewhat more heavily in favor of recovery in a strict products liability action than in ordinary negligence actions is the policy of diverting the burden of product-caused injuries from the innocent victim to the manufacturer. The product manufacturer is generally in a better position than an individual tort-feasor to distribute this burden by passing the costs along to customers in the cost of the product. This is one justification offered for holding manufacturers of defective products strictly liable for injury caused by their products without regard to privity, foreseeability or due care (see, Codling v Paglia, 32 NY2d 330, 341; Prosser and Keeton, Torts, at 692-693 [5th ed]).
Of course, imposing liability on the manufacturer in such circumstances also serves to encourage the development of safer products (Codling v Paglia, supra, at 341; Sukljian v Ross & Son Co., 69 NY2d 89, 95), but this rationale is not a distinctive feature of strict products liability theory, since imposition of liability on a negligent tort-feasor is also based in part on a policy of deterrence (see, McDougald v Garber, 73 NY2d 246, 254). This factor, therefore, does not appear to add anything new to the mix of policy considerations that was not also present in Albala. We recognize, however, that a widely distributed product, if defective, presents a risk to a broad range of potential victims. For that reason, although the need for deterrence is not unique to the products liability context, it may have added weight there.
Despite these considerations, the countervailing ones remain strong enough to preclude us from recognizing a cause of action here. To begin, the concerns we identified in Albala are present in equal measure here. The nature of the plaintiffs’ injuries in both cases — birth defects — and their cause — harm to the mothers’ reproductive systems before the children were conceived — are indistinguishable for these purposes. They raise the same vexing questions with the same "staggering implications” (Albala v City of New York, supra, at 273).[2] As *387 in Albala, the cause of action plaintiffs ask us to recognize here could not be confined without the drawing of artificial and arbitrary boundaries. For all we know, the rippling effects of DES exposure may extend for generations. It is our duty to confine liability within manageable limits (see, Tobin v Gross-man, 24 NY2d 609, 619; Prosser, Palsgraf Revisited, 52 Mich L Rev 1, 27). Limiting liability to those who ingested the drug or were exposed to it in útero serves this purpose.
At the same time, limiting liability in this fashion does not unduly impair the deterrent purposes of tort liability. The manufacturers remain amenable to suit by all those injured by exposure to their product, a class whose size is commensurate with the risk created. In addition, we note that the tort system is not the only means of encouraging prescription drug safety; the Federal Food and Drug Administration has primary responsibility for that task (see, Note, A Question of Competence: The Judicial Role in the Regulation of Pharmaceuticals, 103 Harv L Rev 773). We do not suggest, as some have (see, id.), that for this reason the judicial system should abandon its traditional role. But in light of the FDA’s responsibility in this area, the need for the tort system to promote prescription drug safety is at least diminished.
That the product involved here is a prescription drug raises other considerations as well. First, as in most prescription drug cases (see, Vinson & Slaughter, Products Liability: Pharmaceutical Drug Cases, at 123-140), liability here is predicated on a failure to warn of dangers of which the manufacturers knew or with adequate testing should have known. Such a claim, though it may be couched in terms of strict liability, is indistinguishable from a negligence claim (see, Wolfgruber v Upjohn Co., 72 AD2d 59, affd on opn below 52 NY2d 768). Concepts of reasonable care and foreseeability are not divorced from this theory of liability, as they may be under other strict products liability predicates. Thus, the effort to distinguish this case from Albala is strained.
More important, however, is recognition that public policy favors the availability of prescription drugs even though most carry some risks (see, Brown v Superior Ct., 44 Cal 3d 1049, *388 751 P2d 470, 478-479; Restatement [Second] of Torts § 402A, comment k; Vinson & Slaughter, op. cit., at 123-126). That is not to say that drug manufacturers should enjoy immunity from liability stemming from their failure to conduct adequate research and testing prior to the marketing of their products. They do not enjoy such immunity, as evidenced by our recognition of liability in favor of those who have been injured by ingestion or in útero exposure to DES. But we are aware of the dangers of overdeterrence — the possibility that research will be discouraged or beneficial drugs withheld from the market. These dangers are magnified in this context, where we are asked to recognize a legal duty toward generations not yet conceived.
The dissent would have us believe that this case involves nothing but application of straightforward strict products liability doctrine. But this case is fundamentally different in the same way that Albala was fundamentally different from other negligence cases. In neither this case nor Albala was the infant plaintiff exposed to the defendants’ dangerous product or negligent conduct; rather, both were injured as a consequence of injuries to the reproductive systems of their mothers.
We agree with the dissenter that " Tike cases should be treated alike’.” (Dissenting opn, at 397.) This is not only a fundamental principle of justice, it is also the underpinning of the doctrine of stare decisis. It is, indeed, precisely why we are bound to apply the rule of Albala here, in the absence of some difference between the two cases upon which a principled distinction can be drawn.
The dissent, however, discounts the precedential value of Albala because it was based on "policy grounds” and therefore —in the dissenter’s view — "poses no legal bar to recovery” (dissenting opn, at 394). That the Albala rule is based on policy grounds, however, should not diminish its status as a rule of law. All legal rules, including those the dissent relies upon, are policy-based.
By adhering to Albala, therefore, our decision today follows established law. The dissenter, on the other hand, would expand liability beyond traditional bounds in the face of precedent from this court to the contrary, and accuses the majority of usurping the legislative function by failing to do so (dissenting opn, at 397). It strikes us as a unique view of the judicial role that would allow the court to expand liability at *389 will, but require legislative action before adhering to established limits.
In sum, the distinctions between this case and Albala provide no basis for a departure from the rule that an injury to a mother which results in injuries to a later-conceived child does not establish a cause of action in favor of the child against the original tort-feasor. For this reason, we decline to recognize a cause of action on behalf of plaintiff Karen En-right.
Accordingly, the order of the Appellate Division should be modified, with costs to defendants, by granting defendants’ motions for summary judgment dismissing the third cause of action and, as so modified, affirmed. The certified question should be answered in the affirmative.

. It is true enough, as the dissent points out, that CPLR 214-c is a remedial statute and such statutes should be "liberally construed to effectuate their aims” (dissenting opn, at 392). But even a remedial statute must be given a meaning consistent with the words chosen by the Legislature — those words define the scope of the remedy that the Legislature deemed appropriate. In our view, the role of the courts is to give effect not only to the remedy, but also to the words that delimit the remedy. Under the dissenter’s formulation, apparently, the courts are free to extend the remedy as far as they see fit; the statute merely provides a starting point and a direction.

. This — not fear of defensive medicine — was what we identified in Albala as "the central concern” that led to the policy choice we made in that case (see, 54 NY2d, at 273). The dissent fails to explain why this same *387 concern is not equally implicated here, and thus fails to provide any basis for distinguishing Albala beyond the observation that DES cases are "special” (dissenting opn, at 391, n 1). While we agree that DES cases have unique features, the question is not simply whether DES cases are special, but whether they are different in some way that justifies a departure from the established rule that applies to other cases.