Kenneth WALKER and Judith Walker, Individually, and Kathy Walker, Jennifer Walker, and Nathan Walker, Minors By Next Friend Kenneth Walker, Appellants, (Plaintiffs Below)

v.

Larrie G. RINCK, D.O., and Lake Ridge Laboratory, Inc., Appellees. (Defendants Below)

No. 64S03–9212–CV–952.

Supreme Court of Indiana.

Dec. 2, 1992.

Dawn E. Wellman, Brand & Allen, Greenfield, for appellants Kenneth Walker et al.

Daniel A. Gioia, Robert D. Brown, Spangler Jennings & Daugherty, P.C., Merrillville, Larry G. Evans, Heide B. Jark, Hoeppner, Wagner & Evans Valparaiso, for appellee Larrie Rinck, D.O.

Richard A. Hanning, David C. Jensen, Eichhorn, Eichhorn & Link, Hammond, for appellee Lake Ridge Laboratory, Inc.

## ON PETITION TO TRANSFER

KRAHULIK, Justice.

The issue presented in this case is whether a child has a viable cause of action for injuries allegedly resulting from the negligence of a physician and a medical laboratory prior to the conception of the child. We answer that, under the facts of this case, the child may maintain such a cause of action.

Kathy, Jennifer and Nathan Walker (all minors) (the "Walker children") filed suit against Larrie G. Rinck, D.O., and Lake Ridge Laboratory, Inc., ("Lake Ridge") for injuries allegedly sustained as the result of Lake Ridge's negligent interpretation of tests to determine their mother's blood type and Dr. Rinck's negligent failure to give their mother RhoGAM following the birth of their older sibling. The trial court granted summary judgment in favor of Dr. Rinck and Lake Ridge which the Court of Appeals affirmed. *Walker v. Rinck* (1991), Ind.App., 566 N.E.2d 1088 (Hoffman, P.J., with Garrard, J., concurring and Staton, J., dissenting).

The facts relevant to this case are that, in October 1975, Dr. Rinck informed Mrs. Walker that she was pregnant and Mrs. Walker, who was a nurse, informed Dr. Rinck that she had Rh negative blood.[1] Dr. Rinck ordered blood tests from Lake Ridge. Those tests erroneously reported that Mrs. Walker had Rh positive blood. Consequently, at the time of the birth of her first child in June 1976, no RhoGAM injections were given to Mrs. Walker. In fact, Mrs. Walker had Rh negative blood and the child had Rh positive blood and, thus, Mrs. Walker was exposed to the formation of potentially harmful antibodies. In 1979, Mrs. Walker again became pregnant but had a miscarriage. At this time no RhoGAM was given to her because she had already formed the antibodies following the birth of her first child; once formed, the administration of RhoGAM does nothing to remove the antibodies. In 1980, she became pregnant again and, in May 1981, gave birth to Nathan, who had Rh positive blood. Nathan alleged that he suffered anemia and respiratory problems as a result of the defendants' negligence in improperly interpreting his mother's blood type and in failing to administer RhoGAM following the birth of his older sibling. In 1984, Mrs. Walker became pregnant and, in February 1985, delivered Kathy and Jennifer. Kathy has Rh positive blood and alleges that the defendants' negligence caused her to have hearing impairments, motor skill deficiencies and possible mental retardation. Jennifer has Rh negative blood and alleges that the defendants' negligence has caused her to suffer asthma.

---

1. When an Rh negative woman is pregnant with an Rh positive child, her blood develops antibodies which do not affect the present pregnancy, but can cause damage to later-conceived Rh positive fetuses. An injection of RhoGAM during the first pregnancy can prevent the formation of these antibodies. However, if the injection is not given in a timely manner and the mother's body manufactures the antibodies, no medical treatment is known which can reverse or destroy the antibodies. 3 *Attorney's Dictionary of Medicine* p. R–84 (1986). RhoGAM is a trademark of a preparation of Rh immune globulin. It is used to prevent the formation of antibodies in Rh negative women who have received Rh positive blood. *Id.* at p. R–92.

All three children filed their suits against defendants in December 1985, alleging that the defendants' negligence between October 1975 and the date of birth of their older sibling in June 1976 caused them to have the injuries set forth above. Summary judgment motions filed by the defendants were granted by the trial court, and were affirmed by the Court of Appeals on the basis that (1) Indiana does not recognize a pre-conception tort, and (2) the conduct of the parents in conceiving these children was an intervening, superceding cause of the children's health problems. 566 N.E.2d at 1089–90.

After the Court of Appeals issued its opinion in this case, a different panel of the Court of Appeals, faced with an almost identical case, reached a contrary result. *Yeager v. Bloomington Obstetrics* (1992), Ind.App., 585 N.E.2d 696 (Robertson, Barteau, and Sharpnack, JJ.). Much of the *Yeager* opinion is premised on a case decided by us subsequent to the Court of Appeals' opinion in *Walker*, viz. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992. We grant transfer to resolve the conflict.

## I. STANDARD OF REVIEW

This case was concluded in the trial court by summary judgment. Summary judgment is appropriate only if the pleadings and evidence sanctioned by Indiana Trial Rule 56(C) show that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." T.R. 56(C). Once the movant shows entitlement to summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." T.R. 56(E). In reviewing the propriety of summary judgment on appeal, we note that summary judgments, like all trial court judgments, are clothed with the presumption of validity. *Department of Rev. v. Caylor–Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313. The reviewing court faces the same issues that were before the trial court and follows the same process. *Id.* The party appealing from the grant of summary judgment has the burden of persuading the appellate tribunal that the grant of summary judgment was erroneous. *Id.* The trial court's determination is "carefully scrutinized to assure that the non-prevailing party is not improperly prevented from having his day in court." *Id.*

## II. PRE–CONCEPTION TORT

■ Both defendants argue that the Court of Appeals correctly decided that a "pre-conception tort" should not be recognized in Indiana. Thus, they assert, because the Walker children have not pled a cause of action for which Indiana allows a recovery, the defendants are entitled to summary judgment.

Specifically, Lake Ridge argues that the legislature has, at least in part, addressed the proposition of pre-conception tort and has rejected it by enacting *Ind. Code* § 34–1–1–11 which provides that "[n]o person shall maintain a cause of action ... based on the claim that but for the negligent conduct of another he would have been aborted." Lake Ridge's analysis is flawed because of confusion over the definition of the terms "wrongful life" and "pre-conception tort".

In *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630, 635, we held that "[d]amages for wrongful life are not cognizable under Indiana law." In discussing the concept of a claim for "wrongful life" as distinguished from "wrongful conception or pregnancy" or "wrongful birth", we said:

A brief summary of the prevailing nomenclature may be helpful. An action for "wrongful conception or pregnancy" refers to a claim for damages sustained by the parents of an unexpected child alleging that the conception of the child resulted from negligent sterilization procedures or a defective contraceptive product. This action is recognized in Indiana. The phrase "wrongful birth" applies to claims brought by the parents of a child born with birth defects alleging that due to negligent medical advice or testing they were precluded from an informed decision about whether to conceive a potentially handicapped child or,

in the event of a pregnancy, to terminate it. When such action seeks damages on behalf of the child rather than the parents, the phrase "wrongful life" instead of "wrongful birth" is employed.

*Id.* at 633 (citations omitted). In a footnote, we further distinguished the terms wrongful birth and wrongful life by holding that such phrases "do not apply to cases which allege a defendant's tortious conduct as the cause of abnormalities in infants that would otherwise have been born normal and healthy." *Id.* at 634, n. 2. The latter factual circumstance constitutes a cause of action for a "pre-conception tort" and encompasses the claims of the Walker children. From this discussion, it is easy to ascertain that *Ind.Code* § 34-1-1-11 applies to "wrongful life" cases. Thus, Lake Ridge's reliance on *Ind.Code* § 34-1-1-11 as a legislative preclusion of an action based upon a pre-conception tort is misplaced.

■ Lake Ridge's primary argument, however, is that because recognition of pre-conception torts works a "dramatic innovation" on the tort law of this State, the decision of whether to recognize a claim for pre-conception tort is a matter better left to the legislature. We reject this argument for two reasons. First, it is the traditional role of the highest court of a state to determine the common law of that state even if such determination results in an innovative growth of the common law. *See e.g., Brooks v. Robinson* (1972), 259 Ind. 16, 23, 284 N.E.2d 794, 797 ("The strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs.") Second, we do not envision that the recognition of a pre-conception tort is the new, dramatic innovation of tort law described by Lake Ridge. The dramatic innovation identified by Lake Ridge is the ability of a person not yet conceived at the time of the negligent act to sue the negligent actor. In fact, such has been the case in Indiana for some time. *See, e.g., Second Nat'l. Bank v. Sears Roebuck & Co.* (1979), 181 Ind.App. 1, 390 N.E.2d 229 (alleged negligent installation of furnace). No one would seriously contend that an infant could not recover for

injuries sustained as a result of a defective product, such as an automobile, manufactured prior to the conception of the infant. In those situations, as here, the wrongful conduct occurred prior to the conception of the infant plaintiff. For both of these reasons, we reject the argument that we should refrain from answering the question presented by this case in order to allow the legislature to provide the answer.

Dr. Rinck, in his brief, correctly recognizes that "duty" is the threshold question to be determined when deciding whether a plaintiff may maintain an action in negligence. Without a duty, there can be no recovery in negligence. *Webb v. Jarvis*, 575 N.E.2d 992, 995. Dr. Rinck argues that he did not owe any duty to the Walker children because the physician-patient relationship never existed between them. Although it is true that there was no direct physician-patient relationship between Dr. Rinck and the Walker children at the time he treated their mother, our analysis of a physician's duty to a patient as discussed in *Webb v. Jarvis*, compels us to conclude that, nevertheless, Dr. Rinck owed the children a duty.

■ In *Webb*, we analyzed the duty of a physician to a patient by balancing three factors, namely, (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Id.* at 995. Here, as in *Webb*, we examine each of these three factors in order to determine whether Dr. Rinck owed the three Walker children a duty to inject their mother with RhoGAM at the time of the birth of their sibling nine years previously.

### A. *Relationship Between the Parties.*

■ The duty of a physician to a patient arises from the contractual relationship entered into between the two of them. *Webb*, 575 N.E.2d at 995. Although we refused to extend this duty to unidentified and unknown third persons in the factual situation presented in *Webb*, we specifically recognized that "a duty may be owed to a beneficiary of the consensual relationship,

akin to that of a third-party beneficiary of a contract, where the professional has actual knowledge that the services being provided are, in part, for the benefit of such third persons." *Id.* at 996. Here, the Walker children were the beneficiaries of the consensual relationship between their mother and Dr. Rinck, and Dr. Rinck had actual knowledge that the only reason for the administration of RhoGAM was for the benefit of future children who may be born to Mrs. Walker. Whether or not RhoGAM was given, Mrs. Walker's health and well-being would not be affected. The giving of RhoGAM was to protect future fetuses of Mrs. Walker from developing injuries in utero. We believe that under those circumstances, Dr. Rinck owed a duty to the Walker children and that such duty may have been breached when he failed to give their mother RhoGAM following the birth of her first child.

## B. *Foreseeability.*

It can hardly be argued that the injuries suffered by the Walker children were not foreseeable when the medical reason to give RhoGAM to their mother was to prevent the exact injuries which they allege occurred. In fact, the court in *Albala v. City of New York* (1981), 54 N.Y.2d 269, 445 N.Y.S.2d 108, 429 N.E.2d 786, relied upon by the Court of Appeals, acknowledged that the potential harm to not yet conceived children was easily foreseeable. In *Albala*, the issue was whether a cause of action existed in favor of a child for injuries suffered as a result of a tort committed against the mother prior to the child's conception. Seven years before the birth of the child, the defendant physician had performed an abortion on the mother during which her uterus was perforated. The child alleged that the perforation of the uterus caused injury to him. The court acknowledged that it was foreseeable that the mother would conceive again after the abortion and that those later-conceived children might be adversely affected by the damage to the uterus. Here, as well, the injuries allegedly sustained by the Walker children were foreseeable.

## C. *Public Policy.*

In *Webb v. Jarvis*, we held that we would not place a physician in a position where the physician must weigh the benefits of treatment to the patient against the potential harm to third persons. In *Albala*, 429 N.E.2d 786, the court declined to recognize a duty under the factual situation presented to it because to do so might lead physicians to forego treatment that might benefit the mother but pose a risk to later children, thus placing physicians "in a direct conflict between their moral duty to patients and the proposed legal duty to those hypothetical future generations outside the immediate zone of danger." 429 N.E.2d at 789. No such conflict exists here. The administration of RhoGAM to the mother neither benefits nor harms the mother; it is given only to protect potential fetuses not yet conceived. Surely the public policy of this State follows and is coincident with the well-established medical practice of giving RhoGAM to an Rh negative mother who has given birth to an Rh positive child in order to protect future children of such mother from injury.

We conclude, therefore, that an analysis of duty based upon relationship, foreseeability and public policy compels the conclusion that Dr. Rinck owed a duty to the Walker children to use reasonable care concerning the administration of RhoGAM to their mother. Likewise, Lake Ridge owed a duty to the Walker children to use reasonable care in analyzing Mrs. Walker's blood in order to determine whether she was Rh positive or Rh negative. Thus, defendants were not entitled to summary judgment on the issue of whether a duty was owed. Of course, remaining for trial are the questions of whether defendants breached that duty and whether the breach of that duty proximately caused injury to the plaintiffs. Stated another way, whether Lake Ridge failed to properly administer and report on the blood test and whether the standard of care required Dr. Rinck to order additional blood tests, as the Walker children allege, remain questions for the factfinder.

## III.  INTERVENING CAUSE

The Court of Appeals held that, even if Dr. Rinck breached a duty to the Walker children, such breach could not, as a matter of law, be considered a proximate cause of their injuries.  The Court of Appeals reasoned that:

[t]he conduct of the parents was an intervening, superseding cause of the children's health problems.  The depositions of both parents and the complaint show that the parents were aware of the Rh sensitization in 1979.  Nathan was not born until May of 1981 and the twins were not born until February of 1985....  Clearly, the parents' conduct in conceiving children when knowledge of the Rh sensitization was an intervening, superseding cause of Nathan and Kathy's problems.

566 N.E.2d at 1090 (footnote omitted).  Whether Mr. and Mrs. Walker should have conceived additional children after having knowledge of the risks of doing so or whether they should have aborted these three children may be a matter of great public and private debate.  However, as a court of law, we need not decide this question because we hold that their conduct in conceiving these children was not an intervening, superseding cause.  A superseding, intervening cause sufficient to break the causal chain between wrongful conduct and injury must be one that is not "foreseeable" at the time of the wrongful conduct.  *Elder v. Fisher* (1966), 247 Ind. 598, 606, 217 N.E.2d 847, 852.  Here, the very purpose of giving RhoGAM was to prevent the totally foreseeable consequences of a mother who has developed antibodies from becoming pregnant and delivering a viable child.  It was foreseeable at the time of the laboratory's alleged negligent interpretation of Mrs. Walker's blood type and Dr. Rinck's alleged negligence in failing to give RhoGAM that Mrs. Walker may become pregnant again and deliver additional children.  Because this course of events was foreseeable at the time of the alleged negligent acts, it cannot be an intervening, superseding cause of the Walker children's alleged injuries.

## IV.  STATUTE OF LIMITATIONS

The defendants additionally urge that summary judgment was appropriate because the statute of limitations for the Walker children's actions had run prior to their commencing suit.  We disagree.  *Ind. Code* § 16–9.5–3–1 provides that no claim may be brought against a health care provider based upon professional services unless filed within two years from the date of the alleged act, omission or neglect.  The statute further provides, however, that "a minor under the full age of six (6) years shall have until his eighth birthday in which to file."  All three Walker children had not yet reached their eighth birthdays when this action was commenced.  The defendants urge, and we share their concern, that stale claims may result if children have until their eighth birthdays to bring an action against a physician for failure to administer RhoGAM many years previously.  Nonetheless, this is an area where the legislature has decided the issue by enacting the above-referenced statute of limitations.  It is for the legislature, therefore, to change such statute of limitations.[2]

The defendants claim that allowing this action to proceed will "add fuel to the burning medical crisis in the State of Indiana" contrary to the public policy exhibited by the legislature's enactment of the Indiana Medical Malpractice Act.  They argue that by allowing such claims to be filed, thereby subjecting physicians to medical malpractice suits many years after the date of the alleged negligent act, it will be extremely difficult, if not impossible, to calculate an adequate premium for medical malpractice insurance coverage, making malpractice insurance unprofitable and

---

**2.**  We note in this regard that after the Illinois Supreme Court held in *Renslow v. Mennonite Hospital* (1977), 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250, that a child had a viable claim against a physician for failure to give RhoGAM to the child's mother during a previous pregnancy, the Illinois legislature amended the statute of limitations in Illinois to provide that such a claim must be brought against a physician within eight years of the occurrence.  *Ill.Rev.Stat.* Chapter 110 para. 13–212(b) (Smith–Hurd Supp. 1990).

causing carriers to cease writing medical malpractice insurance in this State. Against this future possibility, which we find dramatically overstated, we must weigh the very real present effect of a proposed holding that the Walker children may not seek compensation for the injuries they allegedly have suffered as a result of the negligent failure to provide their mother with the medicine designed to protect them from those very injuries. We agree with the Court of Appeals' statement in *Yeager v. Bloomington Obstetrics* "that a blanket no-duty rule disallowing all claims based upon alleged pre-conception torts is unnecessary, unjust, and contrary to fundamental and traditional principles of Indiana tort law." 585 N.E.2d at 700.

Further, examination of the cases from other jurisdictions leads us to conclude that the dire consequences forecast by the defendants is overstated. In 1977, the Illinois Supreme Court recognized that a child, not conceived at the time negligent acts were allegedly committed against the mother, had a cause of action against the tortfeasors for injuries to the child. *Renslow v. Mennonite Hospital* (1977), 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250. (Rh negative mother was negligently transfused with Rh positive blood which resulted in injuries to child born nine years later.) The Washington Supreme Court held that a physician's duty may extend to persons not yet conceived at the time of a negligent act or omission. *Harbeson v. Park Davis, Inc.* (1983), 98 Wash.2d 460, 656 P.2d 483, 495. Similarly, the Louisiana Supreme Court, in *dicta*, recognized pre-conception torts. *Pitre v. Opelousas General Hospital* (1988), La., 530 So.2d 1151, 1157. (Court rejected defendant's argument for categorical denial of any duty on the part of a physician to protect a not-yet-conceived child from being born with a birth defect.) Finally, a pre-conception tort claim was recognized by the court in *Monusko v. Postle* (1989), 175 Mich.App. 269, 437 N.W.2d 367, 369. (Alleged failure of physicians to test mother for rubella and to immunize her against rubella prior to conception which caused injury to later-conceived child.) We have not been made aware of any flood of cases descending on the courts in any of those jurisdictions which have recognized such a cause of action. In any event, just as the legislature in 1975 passed the Medical Malpractice Act in response to the then-existing crisis, we believe that the legislature can and will act appropriately if this opinion allows a reconflagration of that crisis.

### Conclusion

Accordingly, we now grant transfer, vacate the opinion of the Court of Appeals, reverse the trial court's grant of summary judgment, and remand this matter to the trial court for further proceedings.

DeBRULER and DICKSON, JJ., concur.

SHEPARD, C.J., dissents, with separate opinion in which GIVAN, J., concurs.

GIVAN, J., dissents, with separate opinion.

SHEPARD, Chief Justice, dissenting.

The new cause of action which the Court now adds to Indiana's legal landscape has two extremely unattractive features.

First, this new tort exposes medical providers to decades or even generations of potential liability. A physician whose treatment of a patient may cause adverse consequences to the patient's future children will be subject to liability until the eighth year after the last child is born. Moreover, it seems probable that some treatments have consequences which pass beyond the second generation and into the third. This is a very long liability tail indeed. It is among the reasons the New York Court of Appeals elected not to start down this trail. *See Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377, 568 N.Y.S.2d 550, 570 N.E.2d 198 (1991).

Second, I think these will be ugly lawsuits. The majority passes lightly over the role of the parents in this case, saying it chooses not to debate whether the parents should have conceived additional children or not after they learned of the health hazards of doing so. Foreswearing debate of this considerable moral choice, the majority flatly declares that their decision to

conceive is not an efficient intervening cause which can be a basis for summary judgment. Actually, under today's decision, the Walkers can create liability for Doctor Rinck by choosing to conceive or eliminate his liability to future children by choosing not to conceive. This seems about as efficient as an intervening cause can get. Inasmuch as this issue is now not resolved on summary judgment, it will now be put to a series of juries. The evidence for and against will not be very pretty, and the predictability of the law as fashioned by juries case-by-case is likely to be erratic.

The real cause of action and the most serious damage in this case is the Walker's loss of their potential to bear additional children secure in the knowledge that those will likely be healthy children. If that were the cause of action at issue today, I would vote for the Walkers.

GIVAN, J., concurs.

GIVAN, Justice, dissenting in part.

The majority opinion correctly observes that Judge Staton dissented to the Court of Appeals opinion in this case. However, I would note that Judge Staton's dissent did agree with the majority opinion in that "Mr. and Mrs. Walker's conduct operated as an intervening superseding cause with respect to the twins, Jennifer and Kathy, I cannot agree that the parents had knowledge of the RH-sensitization and its ramifications prior to the conception of Nathan."

In *Yeager v. Bloomington Obstetrics* (1992), Ind.App., 585 N.E.2d 696, the Court of Appeals opinion, which this Court is affirming, alluded to *Walker v. Rinck* and to Judge Staton's dissenting opinion. In that case, the Yeagers alleged in their complaint that the defendants failed to advise Lorraine Yeager that she had developed an RH sensitization and should avoid further pregnancies. The opposite is true in the *Walker* case. At least after the birth of Nathan, the Walkers were fully advised of their situation and had full knowledge that future pregnancies might result in birth defects.

To say that the defendants would be responsible for birth defects in children conceived after the parents received such knowledge is to hold that parents with such knowledge could continue to produce children and each time a defective child was produced the defendants would be subject to damages. I agree with Judge Staton's observation in his dissenting opinion that this is not a proper extension of liability.

I therefore would remand the case to the trial court for damages only as to Nathan.