KELLY, Judge.
In this medical malpractice action brought by Luis Torres through his mother, Maria Torres, to recover for birth-related injuries, the trial court entered judgment for the appellees, Sarasota County Public Hospital Board, d/b/a Sarasota Memorial Hospital; Gary W. Easter-ling, M.D.; Gary W. Easterling, M.D., P.A.; and the Sarasota County Health Department. The judgment in favor of the appellees followed the entry of a judgment in favor of the doctor who had delivered Luis, Dr. John Sullivan, after the trial court found that Dr. Sullivan had not deviated from the standard of care when he delivered Luis. In Torres v. Sullivan, 903 So.2d 1064 (Fla. 2d DCA 2005), this court reversed the judgment in favor of Dr. Sullivan after concluding that the trial court had improperly rejected the opinion of Luis’s expert on the standard of care. In this appeal, Luis contends that we must reverse the summary judgments in favor of each of the parties to this appeal because they relied on the trial court’s finding that Dr. Sullivan had not deviated from the applicable standard of care. He also argues that although Dr. Easterling raised additional arguments in support of his motion for summary judgment, those arguments cannot sustain the judgment in Dr. Easterling’s favor. We agree.

The Summary Judgment for Dr. Sullivan

During delivery, Luis sustained a bra-chial plexus injury.[1] The complaint alleges that Dr. Sullivan was negligent because he failed to obtain a complete obstetrical history from Mrs. Torres and, as a result, delivered Luis vaginally instead of performing a Caesarean section. The trial court granted Dr. Sullivan’s motion for summary judgment after it concluded that Dr. Sullivan had not deviated from the standard of care when he took Mrs. Torres’s history. The trial court reached its conclusion by rejecting the testimony provided by Mrs. Torres’s expert on the standard of care in favor of conflicting testimony provided by Dr. Sullivan’s expert. This court reversed because the issue of whether Dr. Sullivan’s actions met the applicable standard of care involved “a disputed issue of fact that could not be resolved by the trial judge in a motion for summary judgment.” Id. at 1068.

Sarasota Memorial Hospital

Luis’s complaint alleges that the Hospital is vicariously liable for Dr. Sullivan’s negligence and the negligence of the nurse who assisted him in obtaining Mrs. Torres’s history. In moving for summary judgment, the Hospital asserted that because Dr. Sullivan had been found not to be negligent, the Hospital was exonerated from any vicarious liability for his actions. The Hospital also asserted that if Dr. Sullivan had acted within the standard of care, then so had its nurse, and thus, the summary judgment in favor of Dr. Sullivan exonerated it from any vicarious liability for her actions. Because the Hospital’s motion for summary judgment depended entirely on the trial court’s earlier improper determination that Dr. Sullivan had not deviated from the standard of care, we agree with Luis that our decision in Torres v. Sullivan mandates reversal of the summary judgment in favor of the Hospital.

Sarasota County Department of Health

The complaint alleges that during her pregnancy with Luis and during an earlier pregnancy, Mrs. Torres received prenatal care from the Department of Health. The allegations of negligence *343 against the Department pertain in one way or another to the medical records created and kept by the Department during those pregnancies. In moving for summary judgment, the Department argued that the allegations of negligence against it were no different than those made against Dr. Sullivan and therefore it too was entitled to summary judgment. Although it appears to us that the Department’s characterization of the allegations against it was not entirely accurate, the trial court apparently was convinced by this argument because it granted the Department’s motion. We agree with Luis that the judgment in favor of the Department cannot be sustained because the trial court relied on its erroneous determination that Dr. Sullivan was not negligent.[2]

Dr. Easterling

A year before Luis was born, Dr. East-erling delivered Luis’s sister, Isaura. The complaint alleges that “by virtue of his physician/patient relationship with Mrs. Torres” in connection with Isaura’s birth, Dr. Easterling owed a duty, not only to Mrs. Torres, but also to her unborn[3] son, Luis. The complaint alleges that the standard of care applicable to Dr. Easterling required him to document in Mrs. Torres’s medical records Isaura’s condition at birth and the complications Mrs. Torres experienced during labor and delivery. It also alleges that he was obligated to tell Mrs. Torres that Isaura had suffered an Erb’s Palsy because of birth trauma and that Mrs. Torres should provide this information to future health care providers. The complaint alleges that Dr. Easterling failed to do any of these things and that had he done them, Dr. Sullivan or a reasonable obstetrician under the same circumstances would have had this information and as a result would have performed or ordered a Caesarean section (with Mrs. Torres’s consent) instead of attempting to deliver Luis vaginally.
After the trial court entered the judgment in favor of Dr. Sullivan, Dr. Easter-ling moved for summary judgment. He claimed he was entitled to summary judgment on three grounds: he did not owe a duty to Luis, he was not negligent, and his alleged negligence could not have been the cause of Luis’s damages. The trial court did not specify which ground provided the basis for its ruling in favor of Dr. Easter-ling. On appeal, Luis contends that none of the grounds argued by Dr. Easterling provide a basis to affirm the summary judgment. We agree and write only to discuss the question of whether Dr. East-erling owed a duty to Luis.[4]
*344 Dr. Easterling argues that the summary judgment in his favor was proper because he did not owe a duty of care to Luis. Citing Pate v. Threlkel, 661 So.2d 278 (Fla.1995), Dr. Easterling contends that Luis was not his patient and “before a physician can be found to owe a legal duty of care to a third party not under the care of that physician, it must be shown that the physician is aware of the existence of the third party.” Dr. Easterling contends that he could not have been aware of Luis’s existence because Luis did not exist at the time of his alleged negligence. Dr. Easterling also argues that “the concept of legal duty is based upon whether the defendant’s actions place the plaintiff within a zone of danger” and that the question of duty “presupposes the actual existence of the plaintiff as a member of society capable of being injured as the result of the defendant’s actions.”
In medical malpractice actions, as in other negligence actions, a plaintiff must establish a duty owed to the plaintiff by the defendant, a breach of that duty by allowing conduct to fall below the applicable standard of care, and an injury proximately caused by the defendant’s breach of duty. Moisan v. Frank K. Kriz, Jr., M.D., P.A., 531 So.2d 398 (Fla. 2d DCA 1988). “Unlike most duties, the physician’s duty to the patient is explicitly relational: physicians owe a duty of care to patients.” Restatement (Third) of Torts Liab. For Physical Harm § 41 cmt. h (Proposed Final Draft No. 1, 2005). Thus, the existence of a relationship between a physician or other healthcare provider and a patient is an essential element of a cause of action for medical malpractice because it is that relationship that gives rise to the physician’s duty of care. See Pate, 661 So.2d at 281. We agree that no physician-patient relationship existed between Luis and Dr. Easterling.
The absence of a physician-patient relationship between Luis and Dr. Easterling is not necessarily fatal to his claim, however, because Florida has extended a physician’s duty to third parties in limited circumstances. See, e.g., Pate, 661 So.2d at 282; Gill v. Hartford Accident & Indem. Co., 337 So.2d 420 (Fla. 2d DCA 1976) (physician had a duty to warn the plaintiff, who shared a room with his patient, of his patient’s contagious infection); Cheeks v. Dorsey, 846 So.2d 1169 (Fla. 4th DCA 2003) (physician has a duty to third parties who may be injured as a result of the physician’s failure to take the proper precautions in prescribing a drug to his patient which may interact with alcohol or other drugs); Hofmann v. Blackmon, 241 So.2d 752 (Fla. 4th DCA 1970) (physician has a duty to advise and warn family members of his patient’s contagious disease). The analysis of whether such an extension is appropriate in this case is complicated by the fact that Luis had not been conceived at the time of Dr. Easterling’s alleged malpractice. The question of whether a child has a medical malpractice cause of action for injuries allegedly caused by the negligence of a physician when that negligence occurs before the child is conceived appears to be one of first impression in Florida.
*345 Courts have dubbed the type of claim Luis asserts against Dr. Easterling a “preconception tort.” See, e.g., Grover v. Eli Lilly & Co., 63 Ohio St.3d 756, 591 N.E.2d 696, 698 (1992). Preconception tort actions are generally defined as actions in which the plaintiff is seeking redress for injuries caused by negligent conduct that occurred before the plaintiffs conception. A claim for “wrongful life” is a preconception tort. A “wrongful life” claim is a malpractice action in which the plaintiff child alleges that if the defendant physician had not been negligent in providing medical advice or treatment to the plaintiffs parents, the plaintiff would not have been born.[5] Kush v. Lloyd, 616 So.2d 415, 417 n. 3 (Fla.1992). Most courts that have considered the issue have refused to recognize such an action because of the nature of the “right” invaded — the right not to be born — and the nature of the damages:
The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiffs impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies.
Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689, 692 (1967), abrogated on other grounds by Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979). In Kush, the court confirmed that Florida does not recognize a claim for “wrongful life.” 616 So.2d at 423. In rejecting the claim, the court did not mention that the child asserting the claim had not been conceived at the time of the physician’s alleged negligence. Instead, the court cited the “existential conundrum” created by such a claim. Id.
The claim Luis asserts is not a claim for “wrongful life,” and the damages he seeks are those typically sought in a claim for medical malpractice.[6] Thus, the reasoning the court employed in Kush does not preclude the type of claim Luis asserts. On the other hand, we cannot say that Kush sanctions his claim simply because the court made no mention of the preconception timing of the physician’s negligence as a factor in rejecting the claim for wrongful life. And although we believe it is unwise to read too much into the fact that Kush makes no mention of the preconception timing of the physician’s negligence as a factor in rejecting that child’s claim, the fact that the court never discussed the issue of duty, and either overlooked or ignored the fact that the physician’s alleged negligence occurred before the child was conceived, militates against a conclusion that we should reject Luis’s claim solely because he had not been conceived at the time of Dr. Easterling’s alleged negligence. Instead of adopting a blanket *346 no-duty rule based on the timing of the physician’s alleged negligence, we believe it is appropriate to assess the viability of Luis’s claim as we would any other medical malpractice claim brought against a physician by someone other than a patient.
To assess the viability of Luis’s claim, Dr. Easterling urges us to follow Pate. Luis asserts that Pate undermines Dr. Easterling’s argument and supports finding a duty in this case. In Pate, the plaintiffs mother was diagnosed with a genetically transferable disease. 661 So.2d at 279. The plaintiff alleged that her mother’s physicians knew or should have known of the likelihood that her children would have inherited the condition and that, under the applicable standard of care, the mother’s physicians had a duty to warn the mother that it was important to test her children for the disease. Id. The plaintiff alleged that because the physicians had failed to warn the mother, the plaintiff did not get tested for the disease until it had reached a point where it was incurable. The physicians argued that in the absence of a professional relationship, they did not owe a duty to the plaintiff. Id. at 279-80. Noting that in other professional relationships lack of privity did not preclude the imposition of a duty where a third party was the intended beneficiary of the services rendered, the court concluded that “when the prevailing standard of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties, then the physician’s duty runs to those third parties.” Id. at 282.
In this case, the parties’ experts on the standard of care agreed that it required Dr. Easterling to document Isaura’s difficult delivery and the injury she sustained as a result. Those experts also agreed that the standard exists at least in part because the information is “useful to those who subsequently care for and provide” obstetrical care for the patient. One expert indicated that a doctor must “communicate with the future care givers” and that “if the doctor does not record all complications, he has not completed his task.” The standard of care as articulated by these experts clearly contemplates that the information will be useful in future deliveries to avoid complications that occurred in the past and that might harm the mother or future children.
Even though the standard of care contemplates future children, Dr. Easterling contends that Luis cannot maintain this action because Pate states that the duty only extends to third parties when the physician knows of their existence. He argues that because a future child does not exist, a physician cannot owe that child a duty under the exception created by Pate. For several reasons, we do not read Pate to preclude a duty in this case. First, in Pate, the court was not faced with a case involving preconception medical malpractice where, by definition, the plaintiff will not exist at the time of the alleged negligent act. Second, in Pate, the court tied the existence of a duty to the nature of the standard of care the physician owed to the patient. The standard of care alleged to have been breached in Pate was premised on the physicians’ knowledge of the third parties, the children. In contrast, in this case, the standard of care is premised on the possibility that in the future the patient will have another child. Applying the rationale of Pate to this case, we conclude that Dr. Easterling’s duty extended to Luis.
In reaching this conclusion, we have considered that other states have permitted claims for preconception negligence in analogous circumstances. The cases we find most closely analogous are those in *347 volving a physician’s failure to give a mother Rh immune globulin following the birth of a child.[7] See, e.g., Lynch v. Scheininger, 162 N.J. 209, 744 A.2d 113 (2000); Lough v. Rolla Women’s Clinic, Inc., 866 S.W.2d 851 (Mo.1993); Walker v. Rinck, 604 N.E.2d 591 (Ind.1992). In analyzing whether the physicians in those cases could be liable to a child who was not conceived at the time of the negligent act — the failure to administer Rh immune globulin — the courts were persuaded by the fact that the only reason to administer Rh immune globulin is for the protection of future children. See, e.g., Walker, 604 N.E.2d at 594-95. While on this record we cannot say that the duty to document complications or injuries occurring during labor and delivery is exclusively for the benefit of future children, it is unquestionably done at least in part for their benefit.
We also find it persuasive that our decision to allow a child in Luis’s position to maintain a claim will not impose any obligations on physicians beyond what is already required by the prevailing standard of care. Further, the duty the physician owes to his patient, the mother, is no different than the duty owed to the yet-to-be-conceived child. Thus, there is no conflict between what the physician is obligated to do in caring for the patient and what he is obligated to do to avoid creating a risk of harm to future children. In other words, as a matter of policy, we see no basis under the facts in this case to deny Luis the ability to bring a claim for injuries that he sustained as result of negligence that occurred before he was conceived.
Further, recognizing Luis’s claim is consistent with the policy this court adopted in a case with similar issues. In Day v. Nationwide Mutual Insurance Co., 328 So.2d 560 (Fla. 2d DCA 1976), a child sued for prenatal injuries. The child’s mother was six weeks’ pregnant when she was involved in an automobile accident. When the child was born eight months later, she had “severe cerebral damage.” Id. The defendant argued, among other things, that because a fetus of six weeks was not a “person” in the “constitutional law sense,” it could not be a “person” for the purpose of the lawsuit. Id. at 562.
This court rejected the argument that a nonviable fetus had no legal existence stating, “a child born alive, having suffered prenatal injuries at any time after conception, has a cause of action against the alleged tortfeasor. If the child is born alive, there is a relation-back to the time of injury in order for the infant person to maintain its cause of action.” Id. (footnote omitted). This court stated further that
[hjere, however, the primary concern is the child who has suffered an injury and who in many instances must go through life with an injury or some resulting deformity. Additionally, society also has a very direct concern. A child who is born alive but inflicted with a physical or mental injury or deformity is a potential public charge. Where the injury or deformity is caused by the fault of another, fairness dictates that the financial needs of such child should be borne by the tortfeasor rather than the taxpayer.
Id. While Day involved a postconception injury, the underlying argument was that the defendant could not owe a duty to *348 someone who did not exist. Faced with this previously unrecognized claim, this court chose as a matter of policy to make the alleged wrongdoer answer for his actions rather than deprive the injured party of a remedy, the ultimate result of which would have been to place the financial burden caused by the injury on society rather than the wrongdoer.
Although we have concluded that we are obliged to follow Pate and apply its third-party beneficiary analysis, we note that the majority of courts that have considered medical malpractice claims based on preconception negligence have elected to use a traditional negligence analysis. See, e.g., Renslow v. Mennonite Hosp., 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977); Martin v. St. John Hosp. & Med. Ctr. Corp., 205 Mich.App. 486, 517 N.W.2d 787 (1994); Monusko v. Postle, 175 Mich.App. 269, 437 N.W.2d 367 (1989). In doing so, those courts have analyzed a variety of factors in determining whether to impose a duty, foremost among them, the foreseeability of harm to the plaintiff. Although Pate does not rely on a traditional negligence analysis, it does not completely ignore the concept of foreseeability of harm. Rather, the court noted that “[o]ur holding is likewise in accord with McCain [v. Florida Power Corp., 593 So.2d 500 (Fla.1992) ] because under the duty alleged in this case, a patient’s children fall within the zone of foreseeable risk.” Pate, 661 So.2d at 282. The court does not elaborate, but it seems evident to us that it was simply recognizing that because the alleged standard of care imposed an obligation to protect third parties, provided the physician knew they existed, those third parties necessarily were foreseeable. In this case, the alleged standard of care requires physicians to document certain complications so those complications can be avoided in future deliveries. Thus, future children, such as Luis, are necessarily foreseeable given the nature of the alleged standard of care.
In reviewing cases from other jurisdictions in which courts have employed a traditional negligence analysis, we also examined other factors those courts thought were significant and we found nothing that, if applied to this case, would rule out recognizing a claim like the one Luis asserts. On the other hand, we also found no case where a duty was imposed based on a physician’s failure to properly document complications during labor and delivery. It appears to us that the difference in those cases and in this case may lie in how direct the link is between the plaintiffs injury and the physician’s alleged negligent act. For example, in Monusko, the plaintiff was injured after her mother contracted rubella while she was pregnant with the plaintiff. 437 N.W.2d at 368. The plaintiff alleged that her mother’s physicians provided negligent prenatal care during an earlier pregnancy when they failed to have the mother tested or immunized for rubella. The court looked at the foreseeability óf the harm to the plaintiff in determining whether the physician owed her a duty. Id. at 369. In finding that a duty existed, the court stressed the “direct connection between the test and immunization procedure and the harm ... and the fact that the test and the preconception immunization are specifically designed to prevent rubella syndrome in children that are not yet conceived.” Id. at 370.
In Martin, the plaintiff mother, as the personal representative of her daughter’s estate, brought a wrongful death action after their daughter was stillborn as a result of a rupture of the mother’s uterus. 517 N.W.2d at 788. The estate sued the hospital employing the physicians who performed a Cesarean section on the mother in connection with an earlier pregnancy. *349 The estate alleged the physicians breached their duty to the daughter because when they performed the earlier Cesarean section on the mother, they used an incision that was well known to increase the risk of uterine rupture in later pregnancies. Id. at 789. In rejecting the argument that the physicians did not owe a duty to the child because she was conceived after the earlier Cesarean section, the court framed the issue as whether the parents could maintain an action for the death of their child where “the alleged breach of care in performing the procedure on the mother involves the failure to adhere to a standard of care which contemplates future pregnancies and considers the effect the procedure may have on such pregnancies.” Id. at 790. In concluding that the estate could maintain the action, the court noted the direct connection between the services provided to the mother and the harm that occurred. Id.
These cases are representative of those in which courts have allowed a child to maintain a claim for preconception medical malpractice. Arguably, in those cases the link between the negligent act and the injury to the later-conceived child is more direct than the link in this case. Pate, however, does not expressly include in its analysis a consideration of how directly the injury is connected to the alleged negligent act. Even if we believed that such a consideration was consistent with Pate, if we compare the facts here to those in Pate, we cannot say that the connection between Dr. Easterling’s alleged negligent act and Luis’s injury is more remote than was the connection in Pate. Accordingly, while we realize our holding extends liability to a factual scenario that differs from those typically found in cases recognizing claims for preconception medical malpractice, we conclude that to hold otherwise would be inconsistent with Pate.
Reversed and remanded for further proceedings.
FULMER, C.J., and CANADY, J., Concur.

. A brachial plexus injury is an injury to the nerve bundles which travel from the spinal cord to the arms resulting in Erb’s palsy, paralysis of the upper arm.

.We have not overlooked the fact that in this appeal the Department has raised additional arguments in support of the judgment in its favor, including an argument that its alleged negligence could not have been the cause of Luis’s injury. Those arguments were not made to the trial court at the time of the summary judgment, and the record is not sufficiently developed to permit us to conclude that the Department is entitled to a judgment as a matter of law based on these alternative arguments. See State Farm Fire & Cas. Co. v. Levine, 837 So.2d 363 (Fla.2002). The Department is free to raise those arguments to the trial court on remand.

. The complaint uses the term "unborn.” Luis’s status at the time Isaura was born is more accurately described as “yet-to-be-conceived” rather than “unborn.”

. On appeal, Dr. Easterling has not asserted that we can affirm the summary judgment based on his argument that he was not negligent. In the trial court, his argument regarding causation relied on the summary judgment in favor of Dr. Sullivan and, in light of our decision in Torres v. Sullivan, we agree that this argument by Dr. Easterling cannot provide a basis to affirm the summary judgment in his favor. We recognize that in his arguments to this court, Dr. Easterling has *344 significantly expanded the causation argument he made in the trial court. As was the case with the additional arguments raised by the Department, our record is not sufficiently developed to permit us to conclude that the summary judgment should be affirmed on the basis of the new arguments. In particular, Dr. Easterling's argument relies on factual assertions regarding Dr. Sullivan's actions that, based on the record before us in this appeal, we cannot conclude are undisputed. We express no opinion on the merits of the new arguments, and Dr. Easterling is free to raise them on remand.

. A related claim belonging to parents is a claim for "wrongful birth.” A claim for "wrongful birth” is a medical malpractice claim asserted by parents to recover damages they sustain as a result of the birth of a deformed or impaired child. Kush v. Lloyd, 616 So.2d 415, 417 n. 2 (Fla.1992).

. Through his mother, Luis is claiming damages for loss of future earning capacity, past and future mental pain and suffering, and past and future medical expenses.

. Rh immune globulin is given to Rh-negative women after pregnancies in which they carried Rh-positive babies to prevent the mother's immune system from reacting to the Rh-positive blood of any subsequent child. Without Rh immune globulin, subsequent pregnancies may end in miscarriage, stillbirth, or birth to babies with anemia, jaundice, or other serious health problems.