# FOR PUBLICATION

ATTORNEYS FOR APPELLANT/APPELLEE,
Teresa A. Houser,

**PETER H. POGUE**
**CARLA V. GARINO**
Schultz & Pogue, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE/
APPELLANT, C.K., et al,

**D. BRUCE KEHOE**
**CHRISTOPHER G. STEVENSON**
Wilson Kehoe & Winningham
Indianapolis, Indiana

**FILED**
Aug 10 2012, 9:44 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

TERESA A. HOUSER, Personal Representative )
for the ESTATE OF ANONYMOUS )
PHYSICIAN, Deceased, )
                               )
       Appellant, )
                               )
       vs. )    No. 50A03-1201-MI-19
                               )
STACY KAUFMAN, C.K., )
and BRENT KAUFMAN, )
                               )
       Appellees. )

TERESA A. HOUSER, Personal Representative )
for the ESTATE OF ANONYMOUS PHYSICIAN, )
Deceased. )
                               )
       Appellant, )
                               )
       vs. )
                               )
STACY KAUFMAN, et al., )
                               )
       Appellees, )

**August 10, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Theresa Houser, as Personal Representative of the Estate of Anonymous Physician Dr. K. ("the Estate"), appeals the trial court's denial of the Estate's motion for summary judgment in the medical malpractice suit filed by Stacy Kaufman. C.K. appeals the trial court's grant of summary judgment in favor of the Estate with respect to his medical malpractice claim against Dr. K.[1] We affirm.

## Issues

The restated issues before us are:

    I.    whether Stacy's claim against the Estate is constitutionally time-barred by the Medical Malpractice Act's statute of limitations; and

    II.    whether C.K.'s claim against the Estate fails because Dr. K. owed no duty to C.K.

## Facts

---

[1] Stacy's parents, Mary and Brent Kaufman, also are named plaintiffs in this case. However, the alleged injuries here were sustained by Stacy and her son, C.K. For the sake of simplicity, we will refer only to Stacy and C.K. as the parties.

The evidence most favorable to Stacy and C.K. as the summary judgment non-movants is that Stacy was born to Mary and Brent Kaufman on April 1, 1974. Dr. K. was the Kaufmans' family physician who delivered Stacy and was Stacy's doctor thereafter. When Stacy was born, Dr. K. ordered that a blood test for phenylketonuria ("PKU") be performed on her. Although the blood test revealed that Stacy had PKU, Dr. K. never communicated that result to Mary and Brent.

A physician who counseled Stacy in 2007 described PKU as follows:

> Amino acids are the building blocks for body proteins, and they are converted into different forms by enzymes. Classic PKU is an inherited condition in which a person cannot breakdown the amino acid, phenylalanine, due to a lack in a specific enzyme, which then leads to a build-up in the body. The excess phenylalanine is toxic to the central nervous system and can cause mental retardation, increased muscle tone, microcephaly, and certain physical features. Treatment for PKU is a special diet that restricts the dietary intake of phenylalanine, and must be followed to prevent central nervous system damage. . . .
>
> Women affected by PKU must pay special attention to their diet if they wish to become pregnant, since high levels of phenylalanine in the uterine environment can cause severe malformation and mental retardation in the child. However, women who maintain an appropriate diet can have normal, healthy children.

App. p. 145. As described in the second paragraph, maternal PKU that affects a baby is a condition separate from PKU "and can even affect babies who do not have the PKU disease." See http://medical-dictionary.thefreedictionary.com/phenylketonuria (last visited June 28, 2012).

3

Because Dr. K. never communicated the PKU test results to Mary and Brent or otherwise advised them that Stacy had PKU, she was never placed on a special, low-phenylalanine diet. Early in Stacy's childhood, Mary and Brent noted that she appeared to be developmentally delayed and exhibited other symptoms that were consistent with her having untreated PKU, such as severe diaper rash. Mary and Brent took Stacy to various doctors, including specialists at Riley Children's Hospital in Indianapolis ("Riley") when she was four, to determine the cause of these symptoms. These doctors, however, failed to diagnose Stacy with PKU. Instead, they told Mary and Brent that they "needed to just accept her cognitive impairment and help her learn to live with the problems she was experiencing." Id. at 115. Stacy graduated from high school, although she was placed in special education classes. As an adult, Stacy has an IQ of seventy-four, or "mild to borderline mental retardation . . . ." Id. at 127. She is unable to hold a job and receives public assistance. Dr. K., meanwhile, died in 1981.

Stacy gave birth to C.K. in November 2005. C.K. was born with microcephaly, i.e. a small head, and dysmorphic facial features, but a genetic test performed shortly after birth and a CT scan performed a few months later failed to reveal a cause for these abnormalities. Because of developmental delays and other issues, C.K. visited a specialist at Riley on June 1, 2007. Stacy mentioned during this visit that she was being treated for "lesions" on her brain but that multiple sclerosis had been ruled out. This specialist recommended that C.K. follow up with a medical geneticist, but made no mention of PKU or maternal PKU as a possible cause of C.K.'s difficulties.

4

On July 13, 2007, C.K. was seen by a medical geneticist at Riley. In his written notes of the consultation, the geneticist stated:

> There are several possibilities that could explain [C.K.'s] microcephaly. One of the possibilities could be a maternal infection, however, there is no supporting evidence. Another possibility is a chromosomal problem, but the CGH (comparative genomic hybridization) test ruled out that explanation. There is the possibility of the patient's microcephaly being isolated, or found alone, then again he does exhibit other minor physical findings. The possibility of the patient's mother having PKU . . . or hyperphenylalaninemia should be ruled out due to her blond hair, light skin, and mental delays.

Id. at 145. The geneticist also recommended, among several other things, that someone "[o]btain phenylalanine levels on the mother to rule out maternal PKU or hyperphenalaninemia." Id. Mary does not recall being advised at this visit that Stacy might have PKU, as opposed to being advised generally that further testing was needed.

On August 2, 2007, Stacy visited a neurologist. The neurologist's written notes from the visit stated in part, "Elevated phenylalanine level was confirmed by recent urine quantitation—likely has PKU." Id. at 148. Mary recalls being told by the neurologist at this visit that Stacy "could have PKU, but further testing must be done." Id. at 107. Further testing conducted on August 6, 2007, confirmed the PKU diagnosis, and the neurologist conveyed the news to the Kaufmans on August 7, 2007. Mary then began researching PKU, and on September 18, 2007, she eventually managed to obtain the records of Stacy's birth, including the 1974 test confirming Stacy had PKU that had never been communicated to Mary and Brent.

5

The Kaufmans filed a proposed medical malpractice complaint against Dr. K. with the Indiana Department of Insurance on August 4, 2009, alleging negligence in his failure to communicate the results of the PKU test.[2]  Houser was appointed to be the personal representative for Dr. K.'s estate.  On July 7, 2011, the Estate filed a motion for preliminary determination of law and summary judgment in the trial court, asserting that the two-year statute of limitations of the Medical Malpractice Act ("the Act") barred Stacy's claims and that Dr. K. owed no duty to C.K.  On November 18, 2011, the trial court denied the summary judgment motion with respect to Stacy's claims, concluding that there was a genuine issue of material fact as to whether a constitutionally-based exception to the Act's statute of limitations applied and permitted Stacy's action to proceed, despite the passage of more than two years since the alleged act of malpractice occurred.  However, the trial court granted the Estate's motion for summary judgment with respect to C.K.'s claim, agreeing that C.K. could not recover because of the absence of a physician-patient relationship between C.K. and Dr. K.  C.K. initiated an appeal from this grant of summary judgment, and the Estate sought and received permission to initiate an interlocutory appeal from the denial of summary judgment with respect to Stacy. Although the appeals were separately briefed, we have ordered that the appeals be consolidated and will be issuing one opinion.

**Analysis**

---

[2] The Kaufmans did not attempt to sue the doctors they visited during Stacy's childhood who failed to diagnose that she has PKU.

6

We review a grant or denial of summary judgment de novo. Price v. Kuchaes, 950 N.E.2d 1218, 1225 (Ind. Ct. App. 2011), trans. denied. Summary judgment is proper only if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Ind. Trial Rule 56(C)). In making this determination, courts must construe the evidence in a light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine factual issue against the moving party. Id. at 1226. We may affirm a trial court's summary judgment ruling if it is sustainable on any theory or basis in the record. Id.

## I. Statute of Limitations

We first address whether the Act's statute of limitations bars Stacy's claim against the Estate.[3] Indiana Code Section 34-18-7-1(b) states in part that a medical malpractice claim "may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years of the date of the alleged act, omission, or neglect . . . ." This is an "occurrence-based" rather than "discovery-based" statute of limitations, meaning that "an action for medical malpractice generally must be filed within two years from the date the alleged negligent act occurred rather than from the date it was discovered." Martin v. Richey, 711 N.E.2d 1273, 1278 (Ind. 1999). The statute is

---

[3] The Act "does not apply to an act of malpractice that occurred before July 1, 1975." Ind. Code § 34-18-1-1. Dr. K.'s original failure to communicate the PKU diagnosis allegedly occurred in 1974, but Stacy alleges that his malpractice continued for so long as he treated her and failed to inform her or Mary and Brent of the PKU diagnosis, up until the time of his death in 1981. No party contends that the Act does not govern this case.

constitutional on its face.  Johnson v. St. Vincent Hospital, Inc., 273 Ind. 374, 403-04, 404 N.E.2d 585, 603-04 (1980).  However, the statute violates Article 1, Section 23 and Article 1, Section 12 of the Indiana Constitution in cases where a plaintiff, within the two-year period, does not know, or in the exercise of reasonable diligence could not have discovered, that he or she had sustained an injury as a result of malpractice.  Martin, 711 N.E.2d at 1284.  "[I]n such a case the statute of limitations would impose an impossible condition on plaintiff's access to courts and ability to pursue an otherwise valid tort claim."  Id.  If an act of malpractice and resulting injury cannot be discovered during the limitations period given the nature of the asserted malpractice and the medical condition, the occurrence-based statute of limitations cannot be enforced "without doing violence to the Indiana Constitution."  Van Dusen v. Stotts, 712 N.E.2d 491, 496 (Ind. 1999).[4]

When considering whether the Act's statute of limitations may constitutionally bar a malpractice claim, a court must first "determine the date the alleged malpractice occurred and determine the discovery date—the date when the claimant discovered the alleged malpractice and resulting injury, or possessed enough information that would have led a reasonably diligent person to make such discovery."  Booth v. Wiley, 839

---

[4] We note the Estate seems to argue that Stacy's claim was not tolled by the common law equitable doctrine of fraudulent concealment and, therefore, her claim is barred as a matter of law and we need not engage in the Martin analysis.  In cases pre-dating Martin, our supreme court established that the Act's statute of limitations could be tolled if there was evidence a doctor either actively or constructively concealed an act of malpractice.  See Hughes v. Glaese, 659 N.E.2d 516, 519 (Ind. 1995).  Because the Martin analysis is one of constitutional dimension, we need not address whether the fraudulent concealment doctrine applies in this case.  Even if Stacy's claim could not be saved by the fraudulent concealment doctrine, we are still obligated to determine whether the statute can be applied to bar her claim in a manner consistent with the Indiana Constitution.  Stacy clearly made an argument based upon Martin and its progeny to the trial court and repeats that argument on appeal.  We limit our analysis of this case to the requirements of the Indiana Constitution as outlined in Martin and its progeny.

8

N.E.2d 1168, 1172 (Ind. 2005). "If the discovery date is more than two years beyond the date the malpractice occurred, the claimant has two years after discovery within which to initiate a malpractice action." Id. If, however, discovery is made within the two-year period after the occurrence of malpractice, a suit must be filed within the limitations period, unless it is not reasonably possible to do so. Id. In general, "a plaintiff's lay suspicion that there may have been malpractice is not sufficient to trigger the two-year period." Van Dusen, 712 N.E.2d at 499. On the other hand, a plaintiff need not definitely know or be informed that malpractice caused his or her injury to trigger the beginning of the statutory time period. Id.

In the case of a missed disease diagnosis, the Act's statutory period "does not begin to run until either a correct diagnosis is made or the patient has sufficient facts to make it possible to discover the alleged injury." Brinkman v. Bueter, 879 N.E.2d 549, 554 (Ind. 2008). The Estate suggests in part that the reasoning of cases such as Martin and Van Dusen does not apply here, because those cases involved cancer that had a long latency period, whereas Stacy's PKU manifested itself early in her childhood. However, this court has found no reason to restrict the Martin/Van Dusen analysis to only certain types of diseases, or only to diseases with long latency periods. Shah v. Harris, 758 N.E.2d 953, 958 (Ind. Ct. App. 2001), trans. denied. Regardless of the type of disease, injury, or illness at issue, the question is the same as far as determining a "trigger date" for the statutory period: when did the claimant possess enough information that, in the

9

exercise of reasonable diligence, should have led to the discovery of the alleged malpractice and resulting injury? Id. at 959.

It is often a question of fact as to when a plaintiff discovered facts that, in the exercise of reasonable diligence, should have led to the discovery of the medical malpractice and resulting injury and triggered the statute of limitations. Van Dusen, 712 N.E.2d at 499. The question may become one of law if there is undisputed evidence that a doctor has expressly informed a plaintiff that he or she has a specific injury and that there is a reasonable possibility, if not a probability, that the specific injury was caused by a specific act at a specific time. Id. In such a case, a plaintiff generally is deemed to have sufficient facts to require him or her to seek promptly any additional medical or legal advice needed to resolve any remaining uncertainty or confusion he or she may have regarding the cause of his injury and any legal recourse he or she may have. Id. "The date is also set as a matter of law when there is undisputed evidence that leads to the legal conclusion that the plaintiff should have learned of the alleged malpractice and there is no obstacle to initiating litigation." Herron v. Anigbo, 897 N.E.2d 444, 450 (Ind. 2008). If there are factual issues relating to the triggering of the limitations period, they are to be resolved by the trier of fact at trial. Id. at 452.

Turning to the facts of this particular case, the date of the occurrence of malpractice would have been no later than the death of Dr. K. in 1981, meaning the statute of limitations would have expired sometime in 1983. In cases where the malpractice claim is based upon a failure to diagnose an illness or disease, the occurrence

10

of malpractice extends to, but not beyond, the last opportunity the physician had to give a proper diagnosis. Workman v. O'Bryan, 944 N.E.2d 61, 65-66 (Ind. Ct. App. 2011), trans. denied. Obviously, assuming as the parties appear to do, that Stacy remained Dr. K.'s patient until his death, he could not provide a diagnosis of Stacy's PKU after he had died. The first question then is, should Stacy (or her parents) in the exercise of reasonable diligence have discovered the malpractice and resulting injury sometime before what would have been the running of the statute in 1983? If so, they would have been required to file suit within the two-year limitations period unless it was not reasonably possible to do so. See Booth, 839 N.E.2d at 1172.

We note the evidence in the record that Stacy began exhibiting symptoms of PKU in early childhood, including developmental delays and severe diaper rash. Such evidence leaves open the possibility that Stacy could have been diagnosed with PKU at some point during her childhood, in which case Dr. K's alleged failure to inform Mary and Brent of the newborn PKU test could or should have been discovered much, much earlier than it was—possibly before 1983. The evidence most favorable to Stacy as the non-movant, however, is that her parents did in fact exercise reasonable diligence in attempting to determine the cause of the symptoms they were noticing. Mary and Brent went so far as to have Stacy examined by specialists at Riley, who failed to diagnosis her with PKU. There is no evidence that any of the doctors they visited ever mentioned PKU as a possible cause of her ailments. Instead, they were told that they just needed to

11

"accept her cognitive impairment and help her learn to live with the problems she was experiencing." App. p. 105.

Our supreme court has stated:

> Reliance on a medical professional's words or actions that deflect inquiry into potential malpractice can also constitute reasonable diligence such that the limitations period remains open. Where the plaintiff knows of an illness or injury, but is assured by professionals that it is due to some cause other than malpractice, this fact can extend the period for reasonable discovery.

Herron, 897 N.E.2d at 451. This passage describes what allegedly happened here: Stacy exhibited symptoms of PKU, her parents exercised reasonable diligence to determine what was causing those symptoms, but medical professionals failed to diagnosis the PKU at that time and gave Stacy's parents answers that deflected any inquiry into whether Stacy's ailments could be the result of malpractice. Under such circumstances, the mere fact that Stacy had symptoms of PKU during childhood is not enough to establish as a matter of law that she should have discovered her claim against Dr. K. before 1983. In other words, there is a question of fact as to whether Stacy and her parents discovered or should have discovered an injury and act of malpractice before 1983 and whether they were required to file suit before that time.

We now address when, if not by 1983, Stacy or her parents did discover or in the exercise of reasonable diligence should have discovered her injury and act of malpractice, thus triggering the two-year statute of limitations for purpose of Martin. See Booth, 839 N.E.2d at 1172. We focus our attention on the series of three doctors' visits in the

12

summer of 2007, which finally culminated in a definitive diagnosis that Stacy has PKU. These visits occurred on June 1, July 13, and August 2, 2007. The Estate contends that Stacy gleaned sufficient information of a PKU diagnosis at any one or all of these visits, thus making her proposed complaint filed on August 4, 2009, untimely, as it was filed two years and two days after the latest appointment. We will address each appointment in turn.

The June 1, 2007, appointment was with Dr. Brei, a developmental pediatrics specialist at Riley. This appointment was focused upon possible causes of C.K.'s developmental issues. Dr. Brei seems to have recommended that both Stacy and C.K. undergo genetic testing. His notes of this appointment are unclear, but that is Mary's recollection of the visit.[5] There is no mention in the notes of PKU, nor does Mary recall any such mention. As a matter of law, there is no evidence of anything communicated during this visit that would have put Stacy (or her parents) on notice of any malpractice by Dr. K. or even that she was suffering from undiagnosed PKU.

The July 13, 2007 appointment was with Dr. Weaver, a geneticist at Riley. Mary recalls the visit as follows:

> I remember [Dr. Weaver] telling us that [C.K.]'s problems were likely from a syndrome, but he did not tell us any diagnosis. I do not recall him saying that Stacy might have PKU. I do not recall him saying anything to imply that there was a missed diagnosis at birth, nor was there any mention of a possible claim against Stacy's doctor. The primary thing I recall about that meeting is that Dr. Weaver remained unsure

---

[5] Mary and Brent filed affidavits in opposition to the Estate's summary judgment motion but Stacy did not.

13

of a diagnosis and was planning further tests. The doctor had asked Stacy if she had had any infections during her pregnancy that might account for [C.K.] having microcephaly. She responded that she had a difficult pregnancy, but had had no infections. She did indicate that her neurologist had been treating her for severe headaches, but had not been able to determine the origin. The tests only showed that she had high amino acid levels, but he didn't know what that meant. The doctor said that he wanted to talk to Dr. Strawsburg about this. Nothing definitive was concluded. We were not provided a diagnosis or an explanation at that time, but we were advised that further testing would be done. It seemed we were closer to getting an answer.

App. pp. 106-07. Mary's recollection of the appointment with Dr. Weaver does not reflect that she or Stacy acquired sufficient information at this visit to alert them that Stacy had been suffering for the previous thirty-three years from undiagnosed PKU.[6]

The Estate directs our attention to Dr. Weaver's notes of this visit. In particular, Dr. Weaver states, "The possibility of the patient's mother having PKU . . . should be ruled out . . . ." Id. at 145. The notes also recommend, "Obtain phenylalanine levels on the mother to rule out maternal PKU . . . ." Id. The notes also contain two paragraphs discussing the cause of and treatment for PKU and maternal PKU. Regardless of what is stated in Dr. Weaver's notes, however, it is unclear that everything written in the notes was communicated verbatim to Stacy and Mary. Certainly, on summary judgment, we decline to assume that the content of the notes was repeated verbatim to Stacy and Mary, as opposed to merely relating Dr. Weaver's thoughts on the case. The evidence most

---

[6] The Estate asserts in its brief that Stacy admits that Dr. Weaver told her and Mary that she could have PKU. We see no such admission, especially given Mary's affidavit to the contrary.

14

favorable to Stacy as summary judgment non-movant, reflected in Mary's affidavit, is that there was no definitive mention of PKU by Dr. Weaver during the July 13, 2007 visit.

Finally, we address the appointment of August 2, 2007, which was with a neurologist treating Stacy, Dr. Strawsburg. Between July 13 and August 2, Stacy's urine had been submitted for testing. At the August 2 visit, Mary recalls Dr. Strawsburg telling her and Stacy "that the tests indicated an elevated amino acid level. He mentioned that she could have PKU, but further testing must be done." Id. at 107. Dr. Strawsburg's notes for the visit state, in more definitive language than was used in Mary's recollection, that Stacy "likely has PKU." Id. at 148. As with Dr. Weaver, however, to the extent there is a conflict between Mary's affidavit and Dr. Strawsburg's appointment notes, it is Mary's affidavit that is most favorable to Stacy as the summary judgment non-movant regarding what was actually said to Mary and Stacy by Dr. Strawsburg at the August 2, 2007 appointment.

In fact, there was further confirmatory testing done after the August 2, 2007, appointment. On August 7, 2007, Dr. Strawsburg informed Mary and Stacy by phone that Stacy indeed did have PKU. After receiving this diagnosis, Mary began researching PKU on the internet and learned that Stacy should have been tested for the disease at birth. On September 18, 2007, Mary managed to locate the medical records from Stacy's birth and discovered that Dr. K. had ordered a PKU test at that time and that it was positive.

15

The August 2, 2007, appointment with Dr. Strawsburg arguably comes close to having supplied Stacy with the necessary information to begin investigating whether she had been the victim of medical malpractice. We cannot conclude, however, that this appointment provided Stacy with the necessary information as a matter of law. First, we note the discrepancy between Mary's recollection of what was actually said at the appointment as opposed to what was written in Dr. Strawsburg's notes.

Second, and perhaps more importantly, there is no designated evidence in the record that Stacy or Mary were informed at this visit that Stacy should have been tested for PKU at birth, or that the PKU could have been controlled early in her life if a PKU diagnosis had been communicated in a timely fashion and she had been placed on an appropriate diet. In fact, Mary's affidavit states the opposite, that even as of August 7, 2007, when it was definitively confirmed that Stacy had PKU, she was unaware that Stacy should have been tested for the disease at birth. Reasonable diligence in the context of discovering medical malpractice claims requires a patient to take action if he or she knows of <u>both</u> the injury and/or disease <u>and</u> the treatment that either caused or failed to identify or improve it. <u>Jeffrey v. Methodist Hospitals</u>, 956 N.E.2d 151, 159 (Ind. Ct. App. 2011). Here, even if the evidence can be construed as indicating that Stacy knew or should have known she had PKU as of August 2, 2007, the evidence most favorable to her is that she did not know of the treatment that failed to identify that condition, or did not know that anything even could have been done to help her if the condition had been more timely diagnosed. The Act's two-year statute of limitations

16

would not have been triggered on August 2, 2007. This is entirely unlike a case in which a patient develops symptoms of an injury or illness in close conjunction with medical treatment and begins suspecting that something was wrong with the treatment, at which time the statute of limitations may be triggered. See Williams v. Adelsperger, 918 N.E.2d 440, 447 (Ind. Ct. App. 2009), trans. denied.

At the very least, there is a question of fact in this case as to whether the trigger date for the statute of limitations was August 2, August 7, or September 18, 2007, or some other date and, therefore, whether Stacy's proposed complaint filed on August 4, 2009, was timely. As such, the trial court properly denied the Estate's summary judgment motion premised on the argument that Stacy's proposed complaint was untimely as a matter of law.

We are, of course, fully cognizant that we are permitting a nearly four-decade old claim of malpractice to proceed at this time. Nonetheless, it is not unheard of in our jurisprudence to permit lawsuits based upon decades-old acts of negligence to proceed, under very limited circumstances. See, e.g., Jurich v. Garlock, Inc., 785 N.E.2d 1093, 1095 (Ind. 2003) (holding, in case involving asbestos exposure between 1946 and 1986, that ten-year statute of repose for asbestos-related claims would be unconstitutional as applied if there was evidence a physician could have diagnosed plaintiff with asbestos-related disease within ten years of asbestos exposure but plaintiff had no reason to know of the diagnosable condition until after the ten years had passed). We believe the circumstances here are very limited and highly unlikely to be repeated. We note that this

17

case appears to be, by an order of magnitude of several decades, the longest period of time in which the Martin analysis has been employed in an appellate decision to extend the Act's statute of limitations. Moreover, if the allegations here are true, Stacy has been forced to suffer needlessly from a debilitating, but treatable, illness for almost forty years. Given the highly unique facts here, and given the designated evidence of diligence by Stacy and her parents with respect to her PKU diagnosis (or lack thereof for the first thirty-three years of her life), we conclude that allowing this case to proceed does not contravene public policy and is consistent with the Act's goals of maintaining sufficient medical treatment and controlling malpractice insurance costs by, in part, encouraging the prompt presentation of claims. Van Dusen, 712 N.E.2d at 496.

## II. Duty to C.K.

Next, we address whether Dr. K. owed a duty of care to C.K.[7] As with any negligence claim, a physician must owe a duty to a plaintiff seeking damages for alleged medical malpractice in order for such a claim to proceed. Sawlani v. Mills, 830 N.E.2d 932, 938 (Ind. Ct. App. 2005), trans. denied. "The existence of a duty in a negligence case is a question of law appropriate for appellate determination." Cram v. Howell, 680 N.E.2d 1096, 1097 (Ind. 1997). Generally, Indiana courts employ a three-part test derived from Webb v. Jarvis, 575 N.E.2d 992 (Ind. 1991), for determining the existence

---

[7] We observe that if Dr. K. did owe a duty to C.K., C.K.'s cause of action against Dr. K. is timely and it is governed by a different statute of limitations than Stacy's claim. Indiana Code Section 34-18-7-1(b) provides that although generally a medical malpractice suit must be filed within two years of the alleged act, omission, or neglect, "a minor less than six (6) years of age has until the minor's eighth birthday to file." C.K. was three when the proposed complaint was filed.

of a duty, although that test is not necessarily exclusive. See id. at 1097 n.1. The Webb analysis considers three factors: (1) the relationship between the plaintiff and defendant; (2) the reasonable foreseeability of harm to the person injured by the defendant's conduct; and (3) public policy concerns. Webb, 575 N.E.2d at 995. Application of this balancing test is necessarily case specific. Cram, 680 N.E.2d at 1097.

Although the trial court focused, and the Estate now focuses, on the lack of a physician-patient relationship between Dr. K and C.K. as justification for finding that there was no duty owed, our supreme court clearly has held that such a relationship is not always necessary for the existence of duty in a medical malpractice action. In Cram, for example, our supreme court held that a doctor owed a duty to a third party killed by the doctor's patient in a car crash caused by the patient passing out behind the wheel after seeing the doctor. The doctor had given the patient immunizations that the doctor knew repeatedly caused the patient to lose consciousness, but the doctor failed to monitor the patient for a sufficient amount of time before permitting him to leave the office and failed to warn the patient of the dangers of operating a motor vehicle after receiving the shots. Cram, 680 N.E.2d at 1097-98. In Webb, by contrast, our supreme court held that a physician owed no duty to a third party shot by a patient to whom the physician had prescribed steroids, leading to the patient's psychosis that led to the shooting. Webb, 575 N.E.2d at 997.

The case that requires our scrutiny, because of its similarity to this case, is Walker v. Rinck, 604 N.E.2d 591, 595 (Ind. 1992). In Walker, a woman pregnant with a child

19

who had Rh positive blood was diagnosed as having Rh positive blood herself, when in fact the mother's blood was Rh negative. The mother should have been given, but was not, an injection of RhoGAM to prevent the formation of antibodies that arise when an Rh negative mother is carrying an Rh positive fetus and which antibodies can be harmful to fetuses conceived during future pregnancies. The mother gave birth to three additional children, who alleged that they suffered injuries due to antibodies that could have been prevented from forming if the mother had received a RhoGAM injection at the time of the first pregnancy. The three children sued the lab that tested mother's blood during the first pregnancy and the doctor who had treated her for medical malpractice. The trial court granted summary judgment to the doctor and lab, finding no duty owed to the children, and this court affirmed.

Our supreme court reversed, holding that it was appropriate to recognize a "pre-conception" tort in those circumstances to permit "a person not yet conceived at the time of the negligent act to sue the negligent actor." Walker, 604 N.E.2d at 594. Employing the Webb balancing test, the court first addressed the relationship between the doctor and lab and the injured children. It noted that the only purpose of the RhoGAM injection would have been for the benefit of the children, as the mother's well-being would not have been affected either way if the injection had or had not been given. Thus, the court found that the children "were the beneficiaries of the consensual relationship between their mother" and the doctor. Id. at 595. Regarding foreseeability, the court stated, "It can hardly be argued that the injuries suffered by the Walker children were not

foreseeable when the medical reason to give RhoGAM to their mother was to prevent the exact injuries which they allege occurred." Id. Finally, with respect to public policy considerations, the court noted that the administration of RhoGAM neither harms nor benefits the mother and has no direct relation to her personal health and that there is a "well-established medical practice of giving RhoGAM to an Rh negative mother who has given birth to an Rh positive child in order to protect future children of such mother from injury." Id. Balancing these three factors, the court found the doctor and lab owed a duty to the children. Id. Chief Justice Shepard dissented from this holding, finding in part that it had an "extremely unattractive" feature of potentially exposing "medical providers to decades or even generations of potential liability." Id. at 597 (Shepard, C.J., dissenting).

Because the question of duty is case sensitive and thus may differ from case to case, we do not read Walker as requiring the imposition of a duty upon Dr. K. with respect to C.K. and the PKU testing of Stacy. Regarding the relationship between Dr. K and C.K., the first thing to note is that unlike in Walker, where the three subsequent children were born within one decade of their older sibling and the original negligence, C.K. was born thirty-one years after the alleged negligent act and twenty-four years after Dr. K.'s death. The time span is much more remote than in Walker. Additionally, the Walker majority placed much emphasis on the fact that a RhoGAM injection is solely for the benefit of a mother's future children, not the mother herself. Here, a PKU diagnosis, and a failure to convey such a diagnosis, has a direct and immediate impact on the health of the original patient. In the case of a female patient, such missed diagnosis may have a

21

devastating impact upon a future child, but such impact is more speculative, remote, and secondary than is the case with a missed RhoGAM injection.

Turning to foreseeability, the risk that untreated PKU poses to a fetus is well-documented.[8] We acknowledge that it should have been foreseeable to Dr. K. that if he failed to convey the positive PKU test result to Stacy's parents, that she might someday grow up to have children of her own, who could have maternal PKU. The foreseeability factor is not as strong as in Walker, given the time period involved. There is also the fact that Stacy exhibited symptoms of PKU beginning in early childhood, apart from the blood test, that arguably could have led to a PKU diagnosis well before she had children, but such diagnosis unfortunately did not occur here.

Finally, turning to public policy concerns, we conclude they weigh against a finding of duty. Recognizing duty in a case such as this could extend a physician's potential liability for several decades after an alleged negligent act. This would contravene the Act's purpose of placing reasonable limits upon a physician's exposure to malpractice claims. Additionally, there is no doubt a strong public policy in favor of ensuring that infants are properly tested for PKU and that any such test results be expeditiously conveyed to the infant's parents. However, the original patient him- or herself is directly harmed and sustains injury if a positive PKU test result is not conveyed and the patient may state a claim for malpractice against the doctor. In the Walker/RhoGAM scenario, there is no malpractice-based incentive for the doctor to

---

[8] The Estate does not, at this time anyway, deny that this was well-documented in 1974.

22

provide correct treatment if an injured child could not sue, because the alleged malpractice would have no impact on the patient, i.e. the mother, but only the mother's children; if only the mother could sue, she would have no damages or injury of her own of which to complain. By contrast, the public policy of encouraging PKU testing and conveying of test results is protected by permitting the original patient to pursue a claim against the doctor for improper testing or failing to convey test results.

In balancing the relationship of the parties, the foreseeability of harm, and public policy, we conclude the trial court correctly ruled that Dr. K. owed no duty to C.K. with respect to the PKU testing of Stacy. We acknowledge some tension between our holding on this issue and on the statute of limitations issue, particularly with respect to our concerns regarding the time period between the alleged original negligence and the filing of this lawsuit. Nevertheless, the two issues are governed by different legal standards and, as such, has led to two different results.

## Conclusion

We affirm the trial court's denial of the Estate's summary judgment motion to the extent it sought to bar Stacy's claim under the Act's statute of limitations. We also affirm its granting of summary judgment to the Estate with respect to Dr. K. owing no duty to C.K.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.

23