

**FILED**

Feb 06 2017, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

David J. Cutshaw
Kelley J. Johnson
Gabriel A. Hawkins
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Brett T. Clayton
Kelly H. Eddy
Eichhorn & Eichhorn, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jessica Szamocki, | February 6, 2017 |
| *Appellant-Plaintiff,* | Court of Appeals Case No. 49A02-1603-PL-520 |
| v. | Appeal from the Marion Superior Court |
| Anonymous Doctor and Anonymous Group, | The Honorable Patrick J. Dietrick, Judge |
| *Appellees-Defendants,* | Trial Court Cause No. 49D12-1505-PL-17261 |
| and | |
| Stephen Robertson, Commissioner, Indiana Department of Insurance | |
| *Third Party-Respondent* | |

**Crone, Judge.**

# Case Summary

[1] Jessica Szamocki filed a proposed medical malpractice complaint against Anonymous Doctor and Anonymous Group (collectively "A.D."). A.D. sought summary judgment on the ground that Szamocki's complaint was barred by the applicable statute of limitations. Following a hearing, the trial court granted summary judgment in favor of A.D. Szamocki now appeals. Concluding that Szamocki's claim is indeed time-barred, we affirm summary judgment in favor of A.D.

# Facts and Procedural History

[2] On September 26, 2012, twenty-three-year-old Szamocki went to see A.D. for an initial appointment. Szamocki was referred to A.D., a gastroenterologist, for treatment regarding "stomach issues." Appellant's App. Vol. V at 37. After performing a colon exam and biopsy on Szamocki, on November 12, 2012, A.D. prescribed Lialda (mesalamine) to Szamocki and instructed her to take one tablet per day.[1] A.D. did not inform Szamocki regarding any risks of taking mesalamine, including that mesalamine can cause renal impairment and that the manufacturer of Lialda recommends that a patient's renal function be evaluated both prior to and periodically during treatment with the drug.

---

[1] Lialda is one of the brand names for mesalamine.

[3] On December 10, 2012, Szamocki had a follow-up appointment with A.D.[2]  At that appointment, A.D. told Szamocki to continue taking one tablet of mesalamine per day.  He did not inform her of any risks of taking mesalamine and he did not monitor her renal function.  He told her to schedule a follow-up visit in five to six months "to see how [she] was doing on the [mesalamine]" and to call him "if there are any troubles in the interim."  *Id.* at 38; Appellant's App. Vol. II at 51.  Szamocki returned to A.D.'s office at some point shortly after that appointment to pick up more samples of mesalamine from the receptionist.  Szamocki never scheduled a follow-up appointment.

[4] In March of 2013, Szamocki developed a rash on her arms and also started to develop symptoms of arthritis.  She went to her primary care physician's office and had lab tests performed.  The nurse practitioner at the primary care physician's office noted concerns about Szamocki's "drastically reduced" renal function.  Appellant's App. Vol. III at 98.  Accordingly, Szamocki was referred to a nephrologist, Dr. Richard Hellman.

[5] Szamocki attended an appointment with Dr. Hellman on April 9, 2013.  Dr. Hellman told Szamocki that she was suffering from acute renal failure and that mesalamine, among several other possibilities, may be the cause.  However, Dr. Hellman did not tell Szamocki to stop taking mesalamine.  On April 15, 2013, Szamocki went to see Dr. Michael Stack, a rheumatologist.  Dr. Stack did not

---

[2] We note that Szamocki repeatedly refers to December 12, 2012, as the date of her follow-up visit with A.D., while A.D. refers to December 10, 2012, as the date.  Our review of the designated evidence, specifically the medical records, reveals that December 10, 2012, is the correct date.

tell her to stop taking mesalamine. Then, on May 1, 2013, Szamocki went to see Dr. Michael Sweet, a homeopathic doctor. Dr. Sweet informed Szamocki that her muscles were weak while taking mesalamine. The next day, May 2, 2013, Szamocki decided to stop taking mesalamine due to the side effects.

[6] Thereafter, Szamocki began seeing nephrologist Dr. Melissa Anderson. On September 18, 2013, Dr. Anderson noted that she believed that Szamocki's renal problems were due to mesalamine use. Szamocki had a biopsy performed and, on May 5, 2014, she was told that her renal failure may be caused by chronic use of NSAIDs, medical or herbal supplements, or infection. During a May 23, 2014, appointment with Dr. Anderson, Szamocki was again told that her renal failure may be caused by mesalamine. On September 17, 2014, at an appointment with Dr. Anderson, Szamocki told Dr. Anderson that she wanted to know if it was "clear" that mesalamine caused her renal failure because her family had "recommended that she pursue legal action against the prescribing physician." Appellant's App. Vol. IV at 230. Dr. Anderson told Szamocki that it was not a clear-cut diagnosis. *Id.* Szamocki continued to see Dr. Anderson and other specialists until January 21, 2015. On February 17, 2015, Szamocki went to see Dr. Evamaria Anvari, a nephrologist at the Cleveland Clinic, when she obtained a diagnosis that she believed confirmed that her renal failure was "more likely than not due to the [mesalamine]." Appellant's App. Vol. V at 40.

[7] Szamocki filed her proposed medical malpractice complaint against A.D. on February 25, 2015, alleging that he negligently prescribed mesalamine and failed to monitor her renal function while she was taking the drug. A.D. filed a

motion for preliminary determination and motion for summary judgment, asserting the statute of limitations as a defense to the allegations in the proposed complaint. Szamocki responded to the motion for summary judgment with a designation of evidence. A.D. replied and filed a motion to strike certain affidavit statements on hearsay grounds, as well as certain medical records. A summary judgment hearing was held on January 11, 2016. On March 1, 2016, the trial court entered its findings of fact and conclusions thereon granting summary judgment in favor of A.D. The court also granted A.D.'s motion to strike. This appeal ensued.

## Discussion and Decision

[8] Szamocki appeals the trial court's grant of summary judgment in favor of A.D. We review a grant or denial of a summary judgment motion de novo. *Houser v. Kaufman*, 972 N.E.2d 927, 933 (Ind. Ct. App. 2012), *trans. denied*. "Summary judgment is proper only if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id*; *see* Ind. Trial Rule 56(C). We construe the facts and reasonable inferences established by the designated evidence in favor of the non-moving party. *David v. Kleckner*, 9 N.E.3d 147, 149 (Ind. 2014). Moreover, when a medical malpractice defendant asserts the statute of limitations as an affirmative defense, that defendant "bears the burden of establishing that the action was commenced beyond that statutory period." *Id*. (citation omitted). Once the defendant meets that burden, the burden shifts to the plaintiff to establish "an issue of fact material to a theory that avoids the defense." *Id*.

[9] The Medical Malpractice Act's statute of limitations is found in Indiana Code Section 34-18-7-1(b) and provides in relevant part:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon a professional service or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect ….

This is an "occurrence-based" statute of limitations, "meaning that an action for medical malpractice generally must be filed within two years from the date the alleged negligent act occurred rather than from the date it was discovered." *Houser*, 972 N.E.2d at 933 (citation omitted).

[10] In support of summary judgment, A.D. argues that Szamocki's claim is time-barred because the alleged malpractice occurred when A.D. prescribed mesalamine on November 12, 2012, or at the latest on December 10, 2012, the date of Szamocki's last appointment with A.D., and thus the proposed complaint, filed on February 25, 2015, was filed outside the two-year occurrence-based statute of limitations. In response, Szamocki does not dispute that her last encounter with A.D. occurred on December 10, 2012. However, she argues that (1) the two-year statute of limitations was tolled until May 2, 2013, under the doctrine of continuing wrong, and (2) her complaint was filed within a reasonable time after she exercised reasonable diligence to discover the malpractice. We will address each argument in turn.

## Section 1 – The doctrine of continuing wrong is inapplicable to toll the statute of limitations beyond the date of the last physician-patient encounter.

[11]     Szamocki first asserts that that the two-year occurrence-based statute of limitations was tolled under the doctrine of continuing wrong. "The doctrine of continuing wrong applies where an entire course of conduct combines to produce an injury." *Garneau v. Bush*, 838 N.E.2d 1134, 1143 (Ind. Ct. App. 2005), *trans. denied* (2006). When this doctrine is applicable, the two-year statute of limitations period begins to run at the end of the continuing wrongful act. *Id*. "In order to apply the doctrine, the plaintiff must demonstrate that the alleged injury-producing conduct was of a continuous nature." *Id*.

[12]     In her response to A.D.'s motion for summary judgment, Szamocki argued that A.D. was negligent both in prescribing mesalamine and in failing to monitor her renal function while she was taking mesalamine. First, for the doctrine of continuing wrong to apply, a physician's conduct must be more than a single act. *See Gradus-Pizlo v. Acton*, 964 N.E.2d 865, 871 (Ind. Ct. App. 2012). This Court has determined that the prescription of medicine constitutes a single act of malpractice and not an entire course of conduct, such that the doctrine of continuing wrong does not apply. *Id*. Thus, in order to bring her claim within the continuing wrong doctrine, Szamocki maintains that, in addition to the act of prescribing mesalamine, A.D.'s alleged failure to monitor her renal function while she was taking the drug constituted a continuing wrong which tolled the

statute of limitations until she decided to stop taking the medication on May 2, 2013.

[13] Our supreme court's opinion in *Havens v. Ritchey*, 582 N.E.2d 792 (Ind. 1991), is instructive here, as it recognized the seemingly narrow application of the continuing wrong doctrine in the medical malpractice context. In *Havens*, the plaintiff sought medical care from Dr. Ritchey due to pain in his foot. Dr. Ritchey performed surgery but failed to diagnose or treat the dislocation of one of Havens's toes. Havens returned to Dr. Ritchey numerous times complaining of pain, the last trip occurring on July 3, 1985. Havens then saw a different doctor on October 31, 1985, who finally diagnosed him with a second metatarsophalangeal dislocation. Havens filed his proposed medical malpractice complaint on October 14, 1987, alleging that Dr. Ritchey failed to diagnose his dislocated bone and failed to adequately treat the dislocated bone. Dr. Ritchey moved for summary judgment on the basis that Havens filed his complaint beyond the two-year statute of limitations. The trial court agreed and granted summary judgment.

[14] On appeal, our supreme court noted that Indiana courts have acknowledged the inherent harshness of the occurrence-based statute of limitations on certain plaintiffs, but also have found the rule to be reasonable in light of the other policies intended to be furthered by the rule. *Id*. at 795. In considering application of the continuing wrong doctrine to Dr. Ritchey's alleged failure to diagnose, our supreme court emphasized the importance of the date of the last physician-patient encounter. The court explained,

> Havens last visited Ritchey on July 3, 1985. There is nothing in the record to demonstrate that Ritchey would have had any occasion to diagnose Havens'[s] problem after this date. A physician cannot be under a continuing duty to review all files daily to ensure that he did not misdiagnose a condition of a patient he may not have seen for months or even years. This duty would be completely overwhelming to health care providers, and cut against the purposes of the Medical Malpractice Act. We hold that when the sole claim of medical malpractice is a failure to diagnose, the omission cannot as a matter of law extend beyond the time the physician last rendered a diagnosis.

*Id*.

[15] As a technical matter, we realize that Szamocki's is a claim for "failure to monitor" as opposed to "failure to diagnose." While we recognize that these two negligence theories are not necessarily analogous, under the specific facts presented here, we think that the same reasoning that made the doctrine of continuing wrong inapplicable to toll the statute of limitations beyond the last physician-patient encounter in *Havens* persuades us to reach the same result here. The last time that A.D. saw Szamocki was on December 10, 2012. This was the last opportunity that A.D. would have had to monitor (or fail to monitor) Szamocki's renal function while she was taking mesalamine. Szamocki did not schedule any follow-up appointments with A.D. despite being specifically advised to do so. Accordingly, assuming that a duty to monitor Szamocki's renal function existed, A.D. would not have had any occasion to monitor such renal function after the date of the last physician-patient encounter. Under such circumstances, Szamocki cannot demonstrate

that the alleged injury-producing conduct, i.e., failure to monitor, was of a continuous nature. We conclude as a matter of law that any alleged omission or nonfeasance on the part of A.D. cannot extend beyond December 10, 2012.

[16] This Court's recent opinions in *Gradus-Pizlo* and *Anonymous Physician v. Rogers*, 20 N.E.3d 192 (Ind. Ct. App. 2014), *trans. denied* (2015), also lend support to our conclusion. In *Gradus-Pizlo,* we reversed a trial court's denial of summary judgment because there was no genuine issue of material fact regarding whether the plaintiff's claim was untimely pursuant to the two-year occurrence-based statute of limitations. 964 N.E.2d at 871. The husband/plaintiff filed a malpractice claim against his wife's doctor on April 1, 2008, claiming that the doctor had prescribed his wife medicine on March 12, 2006, that ultimately led to her death. The wife took the medicine for over two weeks before a high potassium level attributable to the medicine led to her cardiac arrest on March 29, 2006, at which time the medication was discontinued. The wife died on April 12, 2006. The doctor filed a motion for summary judgment alleging that the April 1, 2008, complaint was untimely.

[17] To avoid the claim being barred by the statute of limitations, the husband alleged that the doctor's "entire course of care" throughout the wife's hospitalization up until the day of her death was a continuing wrong. *Id*. Despite the wife's continuing daily consumption of the prescribed medicine that eventually led to her death, we reversed the trial court and entered summary judgment in favor of the doctor and, as noted above, held that the alleged medical malpractice consisted of a single act—the prescription of medicine—

not an entire course of conduct. *Id.* We rejected the husband's argument that the doctor's entire course of care related to the prescription of the medicine created a continuing wrong that tolled the limitations period. *Id.* Rather, we held that the two-year statute of limitations began to run on the day the medication was prescribed, not the day the wife stopped taking the medication, and not the day of the resulting injury, the wife's death. *Id.* Thus, we declined to apply the continuing wrong doctrine to toll the statute of limitations. *Id.*

[18] In *Rogers*, we concluded that summary judgment in favor of a physician was proper as there was no genuine issue of material fact that the plaintiff's claim against the physician was untimely filed and that the doctrine of continuing wrong did not apply to toll the two-year occurrence-based statute of limitations. 20 N.E.3d at 201.[3] There, the plaintiff went to see the physician/urologist during which the physician performed a flexible cystoscopy of the plaintiff's bladder and diagnosed the plaintiff with bladder cancer. Between August 2006 and January 2009, the physician performed several cystoscopies on the plaintiff. Before performing each cystoscopy, the physician always disinfected the urology equipment with Cidex OPA; he did so without informing the plaintiff that Cidex OPA manufacturer warnings and medical literature indicated that Cidex OPA was contraindicated for patients with bladder cancer. The plaintiff

---

[3] In *Rogers*, the trial court originally granted summary judgment in favor of the physician but subsequently granted the plaintiff's motion to correct error and set aside the entry of summary judgment. *Id.* at 195. On appeal, we concluded that the trial court abused its discretion in granting the motion to correct error, in effect reinstating the original summary judgment in favor of the physician. *Id.* at 201.

suffered no ill effects from the use of Cidex OPA until March 2008, after which he suffered allergic reactions on three separate occasions following cystoscopies, the last of which occurred on January 7, 2009.

[19] In determining that the continuing wrong doctrine was inapplicable and that the statute of limitations began to run on January 7, 2009, the date of the last injury-producing act, we rejected the plaintiff's claim that the alleged negligence continued beyond that point based upon the physician's failure to investigate the cause of the plaintiff's allergic reactions, read the warning labels or medical literature, or recognize that his use of Cidex OPA was causing the plaintiff's increasingly serious allergic reactions. *Id.* at 199. Indeed, we specifically noted that, even if the continuing wrong doctrine did apply, the doctrine would not toll the statute of limitations beyond the date of the last physician-patient encounter. *Id*. at 200. We emphasized that the physician's last opportunity to determine or recognize that the Cidex OPA was causing injury to the plaintiff was the date the physician last saw the plaintiff, and thus, any dispute of fact regarding what happened after that last encounter was immaterial and insufficient to preclude summary judgment for the physician. *Id*.

[20] In sum, we think that our case law supports a conclusion that the continuing wrong doctrine is inapplicable here to toll the statute of limitations beyond the last physician-patient encounter between A.D. and Szamocki. As we stated above, assuming that a duty to monitor Szamocki's renal function existed, A.D. would not have had any occasion to monitor her renal function after that date. Obviously, we can envision countless scenarios where other facts would come

into play, and the last physician-patient encounter will not be dispositive in determining whether an entire course of care resulted in a continuing wrong in the context of a patient's claim for failure to monitor. The undisputed facts here, however, lead us to conclude as a matter of law that any alleged failure to monitor on the part of A.D. cannot extend beyond December 10, 2012.

## Section 2 – Szamocki discovered the alleged malpractice and resulting injury well within the two-year statute of limitations, and there is no evidence that it was not reasonably possible for her to timely file her claim.

[21] Because the doctrine of continuing wrong does not apply to toll the beginning of the two-year statutory limitations period beyond December 10, 2012, Szamocki's claim filed on February 25, 2015, was per se untimely. Thus, her claim can be saved only if it was not reasonably possible for her to file the claim within the two-year statutory limitations period. *See id.* Our supreme court recently explained,

> [I]n determining whether a medical malpractice claim has been commenced within the medical malpractice statute of limitations, the discovery or trigger date is the point when a claimant either knows of the malpractice and resulting injury, or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. Depending on the individual circumstances of each case, a patient's learning of the resulting disease or the onset of resulting symptoms may or may not constitute the discovery or trigger date. The issue to be determined is the point at which a particular claimant either knew of the malpractice and resulting injury, or learned of facts that would have led a person of reasonable diligence to have

discovered the malpractice and resulting injury. If this date is less than two years after the occurrence of the alleged malpractice, the statute of limitations bars the claim unless it is not reasonably possible for the claimant to present the claim in the remaining time, in which case the claimant must do so within a reasonable time after the discovery or trigger date.

*David*, 9 N.E.3d at 152-53 (citing *Booth v. Wiley*, 839 N.E.2d 1168, 1172 (Ind. 2005)). A plaintiff's lay suspicion that there may have been malpractice is not sufficient to trigger the two-year period; however, a plaintiff need not know with certainty that malpractice caused his or her injury to trigger the running of the statutory time period. *Manley v. Sherer*, 992 N.E.2d 670, 674-75 (Ind. 2013).[4]

[22] It is often a question of fact as to when a plaintiff discovered or should have discovered the medical malpractice and resulting injury and thus triggered the statute of limitations. *Houser,* 972 N.E.2d at 934. However, the question may become one of law if there is undisputed evidence that a doctor has expressly informed a plaintiff that he or she has a specific injury and that there is a reasonable possibility, if not a probability, that the specific injury was caused by a specific act at a specific time. *Id.* "In such a case, a plaintiff generally is

---

[4] In support of her earlier argument regarding the continuing wrong doctrine, Szamocki cites and relies on this Court's opinion in *Manley*, 960 N.E.2d 815 (Ind. Ct. App. 2011), in which transfer was granted and the opinion vacated. *See* 992 N.E.2d 670 (Ind. 2013) (citing Ind. Appellate Rule 58(A)). When transfer is granted, the decision of the Court of Appeals is held for naught and has no precedential value. *See Estate of Helms v. Helms-Hawkins*, 804 N.E.2d 1260, 1268 n. 4 (Ind. Ct. App. 2004), *trans. denied*. Despite being aware of the vacated status of our prior opinion, counsel nevertheless urges us to consider the vacated opinion as "persuasive authority." Appellant's Br. at 17 n.1. We remind counsel that "naught" is defined as "nothing." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriamwebster.com/dictionary/naught (last visited Jan. 19, 2017). Accordingly, our vacated opinion in *Manley* cannot and will not be considered for any purpose.

deemed to have sufficient facts to require him or her to seek promptly any additional medical or legal advice needed to resolve any remaining uncertainty or confusion he or she may have regarding the cause of his injury and any legal recourse he or she may have." *Id.*[5] "The date is also set as a matter of law when there is undisputed evidence that leads to the legal conclusion that the plaintiff should have learned of the alleged malpractice and there is no obstacle to initiating litigation." *Herron v. Anigbo,* 897 N.E.2d 444, 450 (Ind. 2008).

[23] The undisputed facts show that Szamocki was expressly told by doctors on April 9, 2013, and September 17, 2014, and perhaps additional dates in between, that there was a reasonable possibility that mesalamine prescribed by A.D. may be the cause of her renal failure. On those dates, Szamocki possessed enough information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice. The record simply does not support Szamocki's contrary assertions. Szamocki has asserted no fraudulent concealment, incapacity or obstacle to initiating litigation, or any other facts that would suggest that it was not reasonably possible for her to file her claim at the very latest by December 10, 2014.[6] Accordingly, Szamocki's claim is time-

---

[5] Interestingly, the undisputed evidence indicates that Szamocki was employed as a paralegal at the law firm that is now pursing her malpractice claim during all relevant time periods herein. This fact cuts against any assertion that it was not reasonably possible for her to initiate litigation within the two-year period. Although Szamocki likens her situation to that of the plaintiff in *Workman v. O'Bryan*, 944 N.E.2d 61 (Ind. Ct. App. 2011), *trans. denied*, in which we determined that it was not reasonably possible for the plaintiff to file her proposed complaint within the two-year statute of limitations, *Workman* is factually distinguishable and we see little commonality between Szamocki and the plaintiff in *Workman*.

[6] Szamocki does not allege A.D.'s failure to advise her regarding the risks of mesalamine use or the FDA monitoring recommendation as a negligence theory in this case. *Cf. Cox v. Paul*, 828 N.E.2d 907 (Ind. 2005)

barred, and we affirm the trial court's entry of summary judgment in favor of A.D.[7]

[24]    Affirmed.


Kirsch, J., and May, J., concur.

---

(holding that health care provider who has notice of possible dangerous side effect of treatment may be held liable for failure to make reasonable efforts to advise or warn patient). However, even had she made such claim, our result would be the same in light of the undisputed evidence that leads us to a legal conclusion that she discovered her injury and the alleged malpractice less than two years after the occurrence and there was no obstacle to initiating litigation. *Herron,* 897 N.E.2d at 450.

[7] We very briefly address Szamocki's contention that the trial court abused its discretion in granting A.D.'s motion to strike, on hearsay grounds, a portion of her affidavit submitted in opposition to summary judgment. A trial court has broad discretion in ruling on motions to strike in the summary judgment context. *See Graves v. Ind. Univ. Health*, 32 N.E.3d 1196, 1205-06 (Ind. Ct. App. 2015) (citing Ind. Trial Rule 56(E), which provides in part that affidavits "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Here, the trial court struck paragraph 14 of Szamocki's affidavit in which she stated that one of her treating physicians, Dr. Anderson, "discouraged" her from pursuing legal action against A.D. when she allegedly told Szamocki that the causal link between her renal failure and mesalamine "was not a clear cut diagnosis." Appellant's App. Vol. V at 40. Szamocki claims that the statement is not hearsay and is admissible because it was not offered for the truth of the matter asserted, i.e., that the connection between her renal failure and mesalamine was unclear, but instead to explain why she delayed filing suit. Regardless, because we find the statement immaterial to our legal conclusion that it was reasonably possible for her to file suit within the statute of limitations, we need not address whether the trial court abused its discretion in granting the motion to strike.